228 N.J. Super. 211 (1988)
549 A.2d 462
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
JAMES BROWN AND RONALD EMM, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 4, 1988.
Decided October 25, 1988.
*214 Before Judges ANTELL, DREIER and BROCHIN.
Simon Louis Rosenbach, Assistant Prosecutor argued the cause for appellant (Alan A. Rockoff, Prosecutor Middlesex County, attorney; Simon Louis Rosenbach, of counsel and on the brief).
Barry T. Albin, attorney argued the cause for respondent James Brown (Wilentz, Goldman & Spitzer, attorneys; Barry *215 T. Albin, of counsel and on the brief and Jeffrey L. Menkin, on the brief).
William G. Brigiani argued the cause for respondent Ronald Emm (Brigiani, Gelzer, Cohen & Schneider, attorneys; William G. Brigiani, of counsel and on the brief and Phyllis Joy Cohen, on the brief).
The opinion of the court was delivered by DREIER, J.A.D.
The State has appealed from an order of the Law Division granting defendants new and separate trials after a jury found them both guilty of death by auto, N.J.S.A. 2C:11-5, after a 12-day joint trial. The issue of severance had previously been considered at a pretrial motion by a different judge who determined in a reported decision that the joint trial could be held. State v. Brown, 219 N.J. Super. 412 (Law Div. 1987).
There were three versions of the incident which resulted in the death of the innocent victim, Frank Dmitri. Defendants and the State all agree that between 7:30 and 8:00 p.m. on September 23, 1985, 66-year old James Brown and 18-year old Ronald Emm were in the same lane on Morristown Road, Old Bridge, waiting for a stop light at an intersection. Brown was alone in his car a few cars ahead of Emm who was accompanied by his girlfriend Marilyn Decker. When the light turned green, Brown was slow to accelerate. After the intervening cars either turned or passed Brown, according to the State and Emm, Emm passed Brown, and Brown became angry at Emm for doing so. According to Brown, Emm did not complete his pass, but rather followed Brown closely down Morristown Road, flashing his high beams and tailgating. As the cars proceeded down Morristown Road they passed a pick-up truck going in the same direction. The occupants of the truck, Christopher Mosley and Nicholas LaConte, testified that they watched the two cars drive ahead and they appeared to bump each other, although an examination of the vehicles after the *216 eventual accident proved there was no such contact. Mosley placed Emm in front; LaConte testified to the contrary.
The vehicles then came to a stop sign at the intersection of Morristown Road and Route 34. Both turned north onto Route 34, and again the versions diverge. It is clear that the cars drove abreast of each other proceeding north on the two-lane highway, with Brown at least partially in the southbound lane and Emm in the northbound lane. On occasion Emm fell behind Brown. Emm claims that Brown tried to push him off the road onto the shoulder; Brown claims that Emm passed him on the shoulder and then kept turning towards him, forcing Brown into the oncoming southbound lane. He testified he was terrorized by this situation, as he had been since the original tailgating episode on Morristown Road. Brown further contends that although he drove past his house, he was afraid to turn in the driveway, lest Emm and his companion (Brown only saw a second figure in the car, and could not identify it as a man or woman) follow him into the driveway and possibly harm him or his 89-year old mother, who he thought might be home.
While driving north along Route 34, defendants passed a New Jersey Transit bus proceeding in the opposite direction. The driver of the bus, Harry Maskell, testified that he clearly saw defendant Emm riding in the northbound lane and turning his wheel towards Brown's vehicle, forcing Brown into the southbound lane. Maskell had to drive his bus on the shoulder in order to avoid Brown's car. He saw that Emm slowed down, and Brown reentered the northbound lane. As the two cars drove past the intersection of Cottrell Road and Route 34 a fourth witness, Roger Martin, saw the vehicles. Martin testified that the cars appeared to bump each other as they drove side-by-side, both proceeding at the same speed. Brown's car was half in the northbound lane and half in the southbound lane; Emm's car was half in the northbound lane and half on the shoulder. Emm's car then veered to its left, causing Brown's car to move further into the southbound lane. Martin then lost sight of the cars, but soon heard a loud crash, and *217 immediately drove his vehicle to the scene of the accident. Brown's car had hit the Dimitri car head-on. Emm contended that Brown had passed him on the left (he once incorrectly said "right"), veered in front of Emm for about two to three car lengths, hit the curb and then veered back into the southbound lane of traffic, hitting Dimitri's car. The State accepted the version of each defendant insofar as it implicated the other.
After the accident, Emm did not stop, but rather proceeded a short distance to the local volunteer firehouse where he served as a volunteer fireman. He reported the accident to the firemen on duty and the police were called. Emm then returned with the firemen to the scene to give assistance. Neither at that time nor for a period of two days did Emm tell of his own involvement or the circumstances allegedly leading to the accident. Only when he heard that the police were looking for another vehicle did he volunteer his version of the facts. Emm's girlfriend, Marilyn Decker, gave her statement the same time as Emm, and corroborated his story.
LaConte and Mosley in their truck, and Martin in his car, drove to the scene shortly after the accident occurred. All three of these witnesses told police about an apparent drag race between Brown's car and another vehicle. During the search for this other vehicle, the police also found the fourth witness, Harry Maskell, the bus driver.
After the jury verdict finding both defendants guilty of the third degree[1] offense of death by auto, N.J.S.A. 2C:11-5, defendants filed motions for new and separate trials, principally on the ground that their defenses were antagonistic. In the judge's opinion granting a new trial, she agreed with the defendants that their defenses were antagonistic, giving her *218 general views and listing three specific reasons why defendants should be tried separately: (1) two of the witnesses, Mosley and LaConte, gave testimony that was not believable, and Mosley was the sole witness who even partially corroborated Emm's version of the facts; (2) she had improperly admitted evidence of Emm's prearrest silence, thus violating his Fifth Amendment right against self-incrimination; and (3) she had erred by failing to charge the lesser-included motor vehicle offenses of reckless driving and careless driving. Consequently, the judge found there was "a manifest denial of justice under the law."
After analyzing these reasons individually and collectively, and noting the care with which the trial judge complied with the provisions of R. 3:20-1 to support her finding of "a manifest denial of justice," we sustain her grant of new and separate trials for the defendants. We will, however, analyze her reasons one by one.
The trial judge agreed with the defendants' original basis for their motions for a new trial, namely that their defenses were antagonistic. She acknowledged that when the pretrial motion judge denied the motion to sever, he "could not have anticipated" the way this trial developed. In fact, when both defendants renewed their severance motions at the start of the trial, the trial judge herself denied them.
In State v. Brown, supra, 219 N.J. Super. at 419, the motion judge stated that at trial the defendants would have similar defenses, namely that they had neither explicitly nor implicitly agreed with each other to play a "game" of "cat and mouse," and therefore both should be acquitted. Both defendants were foreseen as attacking the State's "theory which is premised on the concert of action between the two." Ibid. The judge cited severance rules in a Connecticut and three federal cases (Id. at 417-418), determining that in those cases where severance had been ordered "the jury, in order to accept the core of testimony offered on behalf of one [defendant], was forced not only to reject the other but to convict as well." Id. at 419. The *219 pretrial judge did not believe that the case would develop along the lines that it did, finding "the defenses antagonistic to each other but not necessarily irreconcilable or mutually exclusive." Ibid.
The trial judge stated that in actuality the trial consisted of the prosecutor putting on a witness, asking a few questions and then leaving it to each defendant's attorney to prosecute the other defendant. The judge noted that the pretrial judge "could not have anticipated the spectacle of Mr. Brown beating up on Mr. Emm and all of the witnesses against Mr. Emm and [the] atmosphere that that created. It was, to put it bluntly, awful...."
In addition to the defendants' antagonistic defenses, the trial judge felt that the testimony given by Mosley and LaConte was not credible. We have separately viewed their versions of the events. Mosley and LaConte apparently testified in a straight-forward manner concerning their observations as the cars passed their truck. Clearly, they were not entirely consistent in all details, but this does not render their testimony incredible. They gave their names to the police as witnesses at the scene and were asked to appear hours later at headquarters to give detailed statements. The part of their testimony which the trial judge found incredible was not their account of the accident, but their evasive explanations of their activities after the accident and before they reached headquarters. This, however, was largely an irrelevant issue.[2]
*220 Yet, we cannot lightly dismiss the trial judge's frank appraisal of the evasiveness of these witnesses, only one of whom partially supported Emm's version of the facts, and the credibility of witnesses Maskell and Martin, who strongly supported Brown's account. The trial judge recognized that credibility is within the province of the jury not the trial court, but in this "messy and aggressive trial being fought between Emm and Brown," the judge's forceful observations as to the credibility of these four witnesses must be given some credence by us.[3]
In State v. Sanchez, 224 N.J. Super. 231 (App.Div. 1988), this court reviewed the question of necessary severance. Judge Deighan there cited with approval the motion judge's reported decision in the preliminary stage of the case before us. In Sanchez, however, each defendant contended the other had shot the victim. Yet as Judge Deighan there noted, neither defendant produced hostile witnesses against the other; there was substantial evidence independent of the defendants' testimony to sustain the conviction; and all of the State's witnesses testified to seeing both defendants enter the premises with weapons, indicating that the defendants were acting in concert, thus subjecting each to accomplice liability. Id. at 248. Under those circumstances, severance was unnecessary.
*221 In the case before us, while the State urged that the defendants were acting in concert, each defendant depicted himself as an innocent victim of the other's aggression. While technically each of the independent witnesses was called by the State, the trial judge made it clear in her oral opinion, and we concur from our reading of the transcript, that the interrogation of the witnesses and parties was to a large extent adversarial between the defendants, rather than between the State and each defendant.
As we noted in Sanchez:
The grant or denial of a motion for severance is entrusted to the sound discretion of the trial court.... Denial of such a motion will not result in a reversal unless there is a showing of prejudice or a mistaken exercise of the trial court's discretion. [Citations omitted; 224 N.J. Super. at 244-245].
In this respect the presumption of validity attached both to the motion judge's denial of the severance motion and to the trial judge's concurrence in that determination at the commencement of the trial. Yet deference must also be given to the trial judge's determination of whether the failure to sever the claims constituted prejudice. The question here is a close one, and turns not only on this point, but also upon the second and third grounds noted by the trial judge: Emm's prearrest silence, and the judge's failure to charge concerning lesser-included traffic offenses.
The trial judge stated that she had mistakenly permitted inquiry into Emm's failure to report his involvement in the incident until two days thereafter. In State v. Deatore, 70 N.J. 100 (1976), the Court held that post-arrest silence cannot be used against a defendant, even in the face of an accusatory statement. But in Jenkins v. Anderson, 447 U.S. 231, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980), the United States Supreme Court determined that neither the Fifth nor Fourteenth Amendment are violated by the use of pre-arrest silence to impeach a criminal defendant's credibility. 447 U.S. at 238, 100 S.Ct. at 2129, 65 L.Ed.2d at 95. The Court determined, however, that each jurisdiction is left to

*222 formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative. [447 U.S. at 239, 100 S.Ct. at 2129, 65 L.Ed.2d at 95].
In State v. Merola, 214 N.J. Super. 108 (App.Div. 1986), certif. den. 107 N.J. 91 (1987), Judge Baime reviewed the authorities on the subject of pre-arrest silence. In Merola the defendant was questioned "concerning his failure to initially contact the police" to volunteer exculpatory information. 214 N.J. Super. at 114. The trial judge there charged the jury that a suspect has no obligation to come forward with exculpatory facts once he has become a subject of criminal investigation, but that the jury could consider defendant's silence prior to that time. Defendant argued that New Jersey's common-law privilege against self-incrimination afforded greater protection than its federal counterpart. This court found it unnecessary in Merola to decide all aspects of the question. Judge Baime there noted the split in authority, but found that for such pre-arrest
silence to be probative, it must appear that the failure to speak was unnatural and that an ordinary person would have come forward with the exculpatory information under the circumstances. [214 N.J. Super. at 118].
In Merola the defendant would not have been expected to have come forward with the exculpatory information since it also had substantial incriminatory content relating to the purchase of drugs in violation of the condition of defendant's probation.
We similarly need not reach this question, for it appears that under Emm's version of the incident Brown had been a foolish and aggressive driver who had even attempted to run Emm off the road. Yet Emm had no notice for two days that the police were seeking the driver of another car, and at that point he came forward. One would have to accept Brown's version of the occurrence for Emm to have been a cause of the accident. If truly Brown had passed Emm, hit the curb and careened into the Dimitri vehicle, then Emm could reasonably have considered that he had discharged any civic or moral duty he may have had by reporting the accident immediately to the firehouse and returning to the scene to try to help. There is no statutory duty on the part of a witness to an accident to stop *223 and render assistance, even if the witness is the driver of a vehicle passed by the offending car which immediately skidded and was involved in a serious accident. Butler v. Jersey Coast News Co., 109 N.J.L. 255, 258-259 (E. & A. 1931). Butler, interpreting the predecessor statute to N.J.S.A. 39:4-129(c), held that such a witness was not "involved" in the accident unless he "crowd[ed] the driver of the [other vehicle] when it passed or that he speeded up to prevent the passage." Id. at 259. Given Emm's version of the accident, his silence was legally permissible. Brown and the State could not claim that if Emm truly believed his version of the facts he had any legal duty to speak before he did.
At most, this is a case where Emm gave a partial statement and therefore may be impeached using his initial report as a prior inconsistent statement. See State v. Provet, 133 N.J. Super. 432 (App.Div. 1975), certif. den. 68 N.J. 174 (1975). See Evid.R. 20, 22 and 63(1).[4] Since we perceive no proof of acknowledged facts which show the silence to be conduct indicative of a consciousness of guilt, comment upon "silence," was not proper here. The trial judge was correct in her ruling on this point, but we do not reach the constitutional issue which she raised. As in Merola, however, if this were the only error, it would have been harmless, although concededly it did play more of a role in this case than in Merola.
When we look at the third point raised by the trial judge, we see that the combined issues require reversal. She charged the jury solely concerning the offense of death by auto which requires proof of a homicide "caused by driving a vehicle *224 recklessly." N.J.S.A. 2C:11-5a. The standards of purposeful, knowing, reckless, and negligent conduct are defined in N.J.S.A. 2C:2-2b(1) through (4). In State v. Concepcion, 111 N.J. 373 (1988), the defendant was convicted of reckless manslaughter based upon his handling of a firearm. The Supreme Court first reiterated that the jury must be given "[a]ccurate and understandable jury instructions in criminal cases," and that "the better practice is to mold the instruction in a manner that explains the law to the jury in the context of the material facts of the case." 111 N.J. at 379. The Court further stated that the standard of recklessness should not have been given merely in the context of an abstract definition, but rather should have been compared "with other mental states such as purposely ..., knowingly ..., and negligently.... The jury's understanding of these distinctions could have been enhanced if these mental states had been clarified by illustrative examples." Id. at 381. Finding the absence of such a tailored charge, the Court directed a new trial.
A similar error was sensed by the trial judge in the case before us. While we disagree that the jury should have been instructed to determine whether either defendant was guilty of a lesser-included motor vehicle offense, see State v. DeLuca, 108 N.J. 98, 110-111 (1987), cert. den. ___ U.S. ___, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987), the judge could have informed the jury that the motor vehicle offenses of reckless driving and careless driving did exist, as illustrations of the concepts of recklessness and criminal negligence.[5] Although either of defendants' conduct may have been reckless along the *225 way, justifying a motor vehicle conviction for reckless driving, the recklessness must have proximately caused the death for defendant to have been criminally responsible. Furthermore, if either defendant had been merely careless, as the term is used in the careless driving statute, N.J.S.A. 39:4-97, in not stopping or otherwise avoiding the aggressive conduct of the other, such carelessness would not rise to the criminally culpable level, even if it was a proximate cause of the accident. Such carelessness under N.J.S.A. 39:4-97 is the approximate equivalent of the criminally negligent standard set forth in N.J.S.A. 2C:2-2b(4), and is by definition insufficient to sustain a conviction for death by auto which requires recklessness. We reiterate that the judge sensed this deficiency and stated it as one of her principal grounds for granting the new trial even prior to the Supreme Court's decision in State v. Concepcion.
We have reviewed this record in detail and recognize that there will be a burden placed upon the State and witnesses by our directing separate new trials for defendants. We cannot, however, lightly disregard the assessment of the specified errors and prejudicial effect of the trial as a whole as expounded by the trial judge.
AFFIRMED.
NOTES
[1] Although the indictment shows the crime as a fourth degree offense, under L. 1984 c. 212 § 1, the offense was raised to one of the third degree. The effective date of the amendment was December 10, 1984, ten months prior to the accident. On retrial, note must be taken of the more severe classification.
[2] We recognize that the subject was relevant to test the witnesses' recollection or even to establish that the statements had not been given under the influence of alcohol. From our reading of the record, it appears that at the time they were both employees of the same alarm company, although they worked out of two different offices. They also had a separate private business interest together. Just prior to the accident they had come from a storage company where they had stored some of their business equipment, and from their statements made to the police at the scene of the accident, it appears that they were on their way to make an alarm installation on their own after each had worked a full day for their employer. Whether they were afraid of revealing a business interest inimical to their then-current employment or had engaged in some other activity that they did not wish to make public, their activities for this intervening period should have been of little concern to the court or jury.
[3] The trial judge did note that Brown's attorney had prosecuted Emm in a more vigorous manner than Emm's attorney had prosecuted Brown, but that most of the evidence had been brought out by the two on cross-examination. While the judge in her charge clearly told the jury that neither party had the burden of proof, the jury after it commenced its deliberations presented the court with a revealing question. It specifically questioned who had the burden of proof. The judge stated:

Frankly I'm not at all surprised that the jury came back with the initial question[:] is it the State's burden and do we have to consider just the State's evidence or the defendants'?
[4] At any retrial, Emm may be examined concerning the initial statements he made at the firehouse or at the scene of the accident, if such statements omitted a significant detail or were otherwise inconsistent with Emm's trial testimony. Such use of a prior inconsistent statement is much different from challenge based upon his complete silence or failure to approach the police. See People v. Conyers, 52 N.Y.2d 454, 420 N.E.2d 933, 438 N.Y.S.2d 741 (Ct. of App. 1981).
[5] On retrial, the defendants should be informed that under State v. DeLuca, supra, they may be tried by the court simultaneously with the jury trial for the included offenses of careless and reckless driving. 108 N.J. at 111. If they are convicted of the indictable offense, they may not be convicted of the lesser-included charges. If the sole evidence of recklessness is conduct proximately relating to the death, then an acquittal on the criminal charge will preclude a motor vehicle conviction by the court for reckless driving, but not careless driving. Cf. DeLuca, at 111.