919 A.2d 107

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT,
v. LAWRENCE A. BROWN, DEFENDANT–
APPELLANT.

Argued November 14, 2006—Decided April 17, 2007.

*Alan Dexter Bowman* argued the cause for appellant.

*Deborah C. Bartolomey,* Deputy Attorney General, argued the cause for respondent (*Stuart Rabner,* Attorney General of New Jersey, attorney).

Justice WALLACE, JR., delivered the opinion of the Court.

In this case, the Appellate Division held that defendant's right to remain silent was not violated when the prosecutor questioned defendant about his pre-arrest silence. Following a violent physical altercation with another man, defendant fled. He was arrested ten months later and charged with assault, robbery, and weapons offenses. At his trial, defendant claimed he was not the aggressor, but merely defended himself when the other man pulled out a knife. The State cross-examined defendant on his pre-arrest conduct in order to challenge defendant's self-defense testimony. The jury found defendant guilty and the Appellate Division affirmed. We now affirm. We hold that when there is no governmental compulsion involved, the State may fairly cross-examine the defendant concerning pre-arrest conduct or silence to challenge his self-defense testimony. We also conclude that the trial court should give a jury instruction that limits the use of that evidence in assessing a defendant's credibility.

I.

At trial, the State presented evidence to show that on September 12, 2002, defendant, Lawrence Brown, and Paul Russell were playing cards outside of Russell's apartment. At some point, defendant asked Russell to borrow some money. Russell refused, claiming he did not have any money. In fact, Russell had $130 in his wallet. Defendant did not believe Russell and called him a derogatory name. Russell left for his apartment where he remained for about an hour and then returned to join the group. When defendant asked for a beer, Russell retrieved a bottle of beer from his apartment, gave it to defendant, and sat down on the porch. Defendant again asked to borrow money and expressed disbelief that Russell had none. Russell turned away and was subsequently struck in the face with a beer bottle, causing Russell to fall backwards.

Defendant then slashed Russell three or four times with the broken bottle, severing a portion of his ear. Russell was stunned.

He heard defendant say "[y]ou made it like this, you make it like this" as defendant reached inside Russell's pocket, took his money, and fled. Russell had a pocketknife in his possession, but did not use it. Unaware of the extent of his injuries, Russell removed his bloody shirt and attempted to find defendant. When Russell paused to rest, a little girl looked at him and said, "you're really bleeding." At that point, Russell returned to his apartment.

By that time, the police had arrived. Officer James Stettner observed Russell's condition. At first, Russell refused medical attention, and Officer Stettner suggested that he look in a mirror. Russell did so and agreed to go to the hospital. Russell's detached ear was located and taken to the hospital, but medical personnel were unable to reattach his ear. Russell received over 900 stitches and his face was permanently scarred and disfigured.

At trial, two of Russell's neighbors testified. Twelve year-old N.B. stated that she heard Russell say "[s]top" and someone else say "[g]ive me money." N.B. told her mother that someone was doing something to Russell. She and her mother opened the back door and saw a man on top of Russell. N.B. identified defendant as the man she saw on top of Russell. She said that defendant ran away and Russell followed after him. N.B.'s mother testified that when she opened the back door of her apartment, she saw defendant on top of Russell, whose face was bloody. She yelled for defendant to stop and then called the police. Officer Stettner testified that when he arrived at the scene he observed a puddle of blood near the door. He found a piece of Russell's ear, bloody shards of green glass, a broken beer bottle, and a blood spattered fifty-dollar bill in the area of the assault.

Detective Robert Schmeltzly, one of the investigating officers, testified that he took a statement from Russell on September 25, 2002, and signed a complaint against defendant. He testified that he attempted to locate defendant but "the information on the street was that he went to Ohio." Defense counsel objected to that comment. At sidebar, the prosecutor argued that defendant would raise self-defense and he wanted to disprove that defense. The

trial court suggested the prosecutor ask, "[d]id you ever hear from [defendant]? ... did [defendant] ever come in and say, ... I understand you're looking for me."

Before the jury, the following exchange between the prosecutor and Detective Schmeltzly took place:

Q. Detective Schmeltzly, did you ever, from September 12th, 2002 until August of 2003, did you ever get contacted by [defendant]?

A. No, I did not, sir.

Q. Did the Phillipsburg Police Department get contacted by [defendant]?

A. No, they did not, sir.

Q. Were any charges filed by [defendant] as a victim during that time?

A. Not that I'm aware of, sir.

Defendant testified in his defense and presented a different set of facts. He stated that he was living in Ohio at the time and was visiting friends on September 12, 2002, when he attended a party in front of Russell's apartment. At some point, he joined Russell and two other men in a card game in the backyard. Russell became agitated after losing money in the card game and continued to be upset when defendant refused to lend him money. After they stopped playing cards, Russell approached him with a knife in his hand and grabbed his shirt. Defendant asked Russell what he was doing and Russell threatened him with the knife. Defendant testified that he reacted in self-defense by striking Russell with a beer bottle. He denied removing money from Russell's person and claimed to have struck Russell only once with a beer bottle.

On cross-examination, defendant admitted that a week after the altercation, he learned that the incident had been reported in the newspaper. The prosecutor asked the following questions:

Q. [L]et's say someone has hit someone with a bottle and cut someone. Would you say they'd know they'd be charged with aggravated assault or some kind of crime?

A. Yes. If you just walk up to—yes.

Q. So unless you come forward and say, he cut me, he tried to cut me first, Phillipsburg police, unless you do that, didn't you realize that you would very possibly be charged with aggravated assault by the Phillipsburg police department?

Defendant responded that he did not know the extent of any injury or whether Russell would report it or file charges. The prosecutor then engaged defendant in the following exchanges:

Q. You got a brother who is looking for you, right? His brother.

A. Right.

Q. You got it in the papers. Lawrence Brown does something that caused blood. Only a week after the incident, right?'

A. Right.

Q. And what do you do, Mr. Brown? Do you call the Phillipsburg police, say, hold on a minute? Do you do that?

A. No.

Q. Do you call the Phillipsburg police and say, wait a minute, this is not how it is, he tried to stab me? Did you do that?

A. I didn't know what it said.

. . . .

Q. Did you ever at any time after September 12th, 2002 call the Phillipsburg police department?

A. No, I did not.

Q. Did you ever, since September 12th, 2002, sign a complaint?

A. No, I did not.

Q. Did you at any time since September 12th, 2002 try to contact the prosecutor's office to explain your side of the story?

A. No, I did not.

Q. Did you ever at any time, between September 12th, 2002 and August of '03, decide to come into Phillipsburg, either the police station or to the prosecutor's office or anywhere, and find out if there were any charges against you or anything?

A. No, I did not.

During summation, defense counsel advanced self-defense evidence and criticized the police investigation. He asked the jury to consider why the police did not try to locate defendant sooner to obtain his side of the story. In response, the prosecutor told the jury that Russell's version was credible, defendant's version was not, and that the logical thing would have been for defendant to call the police. The prosecutor stated that defendant

knew what he did. [Defendant] knew what he did. He hit the guy with a bottle, slashed him, took his money out and ran. That's what he did. And a year and a half later files a motion for self defense because the law says you're allowed to do that and I have to prove, beyond a reasonable doubt, that's not self defense. I'm happy to do that. That's my burden. That's the law.

The jury found defendant guilty of second-degree aggravated assault, third-degree aggravated assault, first-degree robbery, fourth-degree unlawful possession of a weapon, and third-degree possession of a weapon for an unlawful purpose. At sentencing, the trial court imposed an aggregate term of ten years in prison with eighty-five percent to be served without parole.

In an unpublished, per curiam opinion, the Appellate Division affirmed. The panel held that because there was no governmental compulsion involved, "defendant's pre-arrest silence during that ten-month period was properly admitted for impeachment purposes, from which the jury could have inferred that his 'silence was indicative of prevarication when measured against his testimonial version' of the incident." (Citation omitted). The panel also held that the trial court's failure to give an instruction limiting the use of defendant's silence to impeachment was not plain error.

We granted defendant's petition for certification. 187 *N.J.* 81, 899 *A.*2d 304 (2006).

## II.

Defendant argues that the State's eliciting of evidence of his silence after the incident to satisfy its burden of disproving self-defense, and the substantive use of his silence, violated his constitutional right against self-incrimination. He adds that he was under no obligation to volunteer his exculpatory story to the authorities at the first opportunity, and that the admissibility of pre-arrest silence is unclear after this Court's decision in *State v. Muhammad*, 182 *N.J.* 551, 868 *A.*2d 302 (2005). Further, defendant asserts that the trial court's failure to provide the jury sua sponte with a limiting instruction further exacerbated the error.

The State counters that it did not violate defendant's privilege against self-incrimination because it may lawfully comment on pre-arrest silence that does not occur at or near the time of arrest. The State argues that *State v. Brown*, 118 *N.J.* 595, 573 *A.*2d 886 (1990) established that pre-arrest silence may be used for im-

peachment purposes if the silence significantly precedes the arrest and no governmental compulsion is involved.

## III.

### A.

██ Pursuant to the Fifth Amendment to the United States Constitution, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." *U.S. Const.* amend. V. The police are required to give a person taken into custody *Miranda* rights. *Miranda v. Arizona,* 384 *U.S.* 436, 467–73, 86 *S.Ct.* 1602, 1624–27, 16 *L.Ed.*2d 694, 719–23 (1966). If defendant exercises the right to remain silent, then the State may not "impeach a defendant's exculpatory story, told for the first time at trial, by cross-examining the defendant about his failure to have told the story after receiving *Miranda* warnings at the time of his arrest." *Doyle v. Ohio,* 426 *U.S.* 610, 611, 96 *S.Ct.* 2240, 2241, 49 *L.Ed.*2d 91, 94 (1976) (footnote omitted). This is so because "every post-arrest silence is insolubly ambiguous." *Id.* at 617, 96 *S.Ct.* at 2244, 49 *L.Ed.*2d at 97. However, the Court noted that

> the fact of post-arrest silence could be used by the prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.
>
> [*Id.* at 619 n. 11, 96 *S.Ct.* at 2245, 49 *L.Ed.*2d at 98 (citation omitted).]

██ We do not have a provision in our State Constitution similar to the Fifth Amendment, but our "privilege against self-incrimination . . . is deeply rooted in this State's common law and codified in both statute and an evidence rule." *Muhammad, supra,* 182 *N.J.* at 567, 868 *A.*2d 302; *see also State v. Deatore,* 70 *N.J.* 100, 113–14, 358 *A.*2d 163 (1976). Both *N.J.S.A.* 2A:84A–19 and *N.J.R.E.* 503 provide that "every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him or expose him to a penalty or a forfeiture of his estate."

Recently, in *Muhammad, supra,* we held that a defendant's "silence while in custody, under interrogation, or 'at or near' the time of his arrest cannot be used against him in a criminal trial." 182 *N.J.* at 558, 868 *A.*2d 302. In *Muhammad,* the defendant, who was a police officer, drove M.M. to the police station and reported to the desk sergeant that M.M. "had been harassing his brother and sister." *Id.* at 560, 868 *A.*2d 302. At that point, M.M. called the defendant a liar, accused him of raping her, and produced a condom. *Ibid.* The defendant sought to leave, but the desk sergeant prevented him from doing so and effectively placed him in custody. *Id.* at 561, 868 *A.*2d 302. Thereafter, the defendant remained silent. *Id.* at 562–63, 868 *A.*2d 302. At trial, the prosecutor elicited testimony and commented on the "defendant's silence both 'at or near' the time of his arrest and when he was in police custody." *Id.* at 573, 868 *A.*2d 302. The defendant did not testify. *Id.* at 562, 868 *A.*2d 302. We reversed his conviction, holding that a prosecutor may not comment on a defendant's silence which "arises 'at or near' the time of arrest, during official interrogation, or while in police custody." *Id.* at 569, 868 *A.*2d 302 (citations omitted). We reasoned that "[b]arring the use of silence 'at or near' the time of arrest avoids the often murky inquiry into pinpointing the precise moment a suspect is placed in custody or under arrest." *Ibid.*

In the present appeal, we must determine whether that same reasoning pertains to pre-arrest silence that does not involve government compulsion at or near the time of arrest, and in cases in which the defendant testifies at trial.

The United States Supreme Court has approved the admission of such evidence. *Jenkins v. Anderson,* 447 *U.S.* 231, 235–38, 100 *S.Ct.* 2124, 2127–29, 65 *L.Ed.*2d 86, 92–95 (1980). In *Jenkins,* the defendant was arrested for murder two weeks after the death of the victim. *Id.* at 232, 100 *S.Ct.* at 2126, 65 *L.Ed.*2d at 90. At his trial, the defendant testified that he committed the murder in self-defense. *Ibid.* On cross-examination, the prosecutor attempted to impeach the defendant's credibility by questioning why the defen-

dant did not speak out immediately if he had acted in self-defense. *Id.* at 235, 100 *S.Ct.* at 2127, 65 *L.Ed.*2d at 92. Following the defendant's conviction, the defendant appealed, asserting that his right to remain silent was violated. *Id.* at 234, 100 *S.Ct.* at 2127, 65 *L.Ed.*2d at 92. The Court held that the "Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility." *Id.* at 238, 100 *S.Ct.* at 2129, 65 *L.Ed.*2d at 94–95. The Court reasoned that because "impeachment follows the defendant's own decision to cast aside his cloak of silence and advances the truth-finding function of the criminal trial," there is no constitutional violation. *Id.* at 238, 100 *S.Ct.* at 2129, 65 *L.Ed.*2d at 94. Nevertheless, the Court noted that state courts need not follow its decision to allow impeachment through the use of pre-arrest silence and that "[e]ach jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative then [sic] prejudicial." *Id.* at 240, 100 *S.Ct.* at 2130, 65 *L.Ed.*2d at 96.

## B.

This Court subsequently addressed a similar issue in *State v. Brown.* In *Brown, supra,* the defendant, Emm, and co-defendant, Brown, participated in a vehicle race until Brown's vehicle struck an innocent motorist resulting in a fatal crash. 118 *N.J.* at 600, 573 *A.*2d 886. Emm, a voluntary firefighter, then drove to the fire department, reported the accident without explaining his involvement, and returned to the scene to give assistance. *Id.* at 602–03, 573 *A.*2d 886. Several days later, Emm related his role in the accident to the police. *Id.* at 603, 573 *A.*2d 886. At trial, Emm changed his story and testified that he was innocent of any wrongdoing, but blamed Brown for the accident. *Id.* at 601, 573 *A.*2d 886. The prosecutor and Brown's counsel were then permitted to question Emm about his silence at the accident scene, but were prohibited from commenting on his silence in summation. *Id.* at 609–10, 573 *A.*2d 886.

This Court looked to the codification of the right to remain silent in *N.J.S.A.* 2A:84A–19 and *Evid. R.* 25 (currently *N.J.R.E.* 503), and found that both describe " 'a right to refuse to disclose' incriminating matter 'in an action, or to a police officer or other official.' " *Id.* at 612, 573 *A.*2d 886. The Court found that our law was "in general conformity with *Jenkins*," and that "the probative worth of such pre-arrest silence should be considered objectively." *Id.* at 613, 573 *A.*2d 886. The Court concluded that "pre-arrest silence may be admitted for impeachment purposes provided no governmental compulsion is involved." *Ibid.* The Court explained that in assessing the admissibility of pre-arrest silence, the trial court must consider all of the surrounding circumstances. *Ibid.* The Court further noted:

> If it can be inferred by the fact-finder that a reasonable person situated as the defendant, prior to arrest, would naturally have come forward and mentioned his or her involvement in the criminal episode, particularly when this is assessed against the defendant's apparent exculpatory testimony, then the failure to have done so has sufficient probative worth bearing on defendant's credibility for purposes of impeachment.
>
> [*Id.* at 613–14, 573 *A.*2d 886.]

Based on the surrounding circumstances, the Court found that the probative worth of Emm's pre-arrest silence, "whether that entailed a consciousness of guilt, a desire not to become involved, a feeling that it was simply unnecessary, or a belief that he had already fulfilled whatever duty he had," should be left to the jury "in assessing Emm's credibility." *Id.* at 615, 573 *A.*2d 886.

Prior to *Brown*, this Court approved the admissibility of pre-arrest silence to impeach the defendant's testimony at trial in *State v. Burt,* 59 *N.J.* 156, 279 *A.*2d 850 (1971), *cert. denied,* 404 *U.S.* 1047, 92 *S.Ct.* 728, 30 *L.Ed.*2d 735 (1972). The Court summarily affirmed the defendant's conviction for the reasons expressed in the Appellate Division decision. *Id.* at 157, 279 *A.*2d 850. In the Appellate Division decision, the panel explained that the defendant was arrested for the murder of his friend. *State v. Burt,* 107 *N.J.Super.* 390, 391–92, 258 *A.*2d 711 (App.Div.1969). At trial, the State made no reference to the defendant's silence in its case-in-chief. *Id.* at 393, 258 *A.*2d 711. The defendant testified

that he had been drinking with the victim, the victim pointed a gun at him, a struggle ensued, and the gun accidentally discharged, striking the victim. *Id.* at 392, 258 *A.*2d 711. On cross-examination the State was able to establish that the defendant never told the police that the shooting was accidental. *Ibid.* The Appellate Division affirmed the defendant's conviction, declaring that when the defendant testified, he waived his right to remain silent and "thereby subjected himself to cross-examination as to the credibility of his story." *Id.* at 393, 258 *A.*2d 711. The panel found that the testimony was relevant to "the credibility of his courtroom testimony." *Ibid.; see also Deatore, supra,* 70 *N.J.* at 118, 358 *A.*2d 163 (explaining that *Burt* was "not a true case of silence in police custody as to an exculpatory story, but rather one of *conduct,* albeit non-action, after the charged crime inconsistent with defendant's story at trial").

We recognize that other jurisdictions are split on whether the use of pre-arrest silence violates a defendant's state constitutional rights. *See* Marcy Strauss, *Silence,* 35 *Loy. L.A. L.Rev.* 101, 129–30 (2001). *Compare Mallory v. State,* 261 *Ga.* 625, 409 *S.E.*2d 839, 843 (1991) (declaring that comment on pre-arrest silence "will not be allowed even where the defendant has not received Miranda warnings and where he takes the stand in his own defense"), *with State v. Sorenson,* 143 *Wis.*2d 226, 421 *N.W.*2d 77, 90 (1988) (noting that comment on pre-*Miranda* silence is allowed once defendant testifies).

 To be sure, *Brown* and *Burt* are the established law in New Jersey. Regardless of whether we would agree with those cases that pre-arrest silence may be admitted for impeachment purposes when no governmental compulsion is involved if we were addressing the issue for the first time, we are obliged to follow them under principles of stare decisis. "[E]ven in constitutional cases, the doctrine [of stare decisis] carries such persuasive force that we have always required a departure from precedent to be supported by some special justification." *Dickerson v. United States,* 530 *U.S.* 428, 443, 120 *S.Ct.* 2326, 2336, 147 *L.Ed.*2d 405,

419 (2000) (quoting *United States v. Int'l Bus. Machs. Corp.*, 517 *U.S.* 843, 856, 116 *S.Ct.* 1793, 1801, 135 *L.Ed.*2d 124, 137 (1996)) (internal quotations omitted). In light of the established history of *Brown* and *Burt,* we find no such special justification to overrule those cases. We continue to adhere to the view that when a defendant testifies, "pre-arrest silence may be admitted for impeachment purposes provided no governmental compulsion is involved." *Brown, supra,* 118 *N.J.* at 613, 573 *A.*2d 886.

## C.

Defendant has a constitutional right not to testify. The risk of cross-examination is a factor most, if not all, defendants will consider in deciding whether to take the stand. However, once the defendant elects to testify, similar to every other witness, the defendant has an obligation to tell the truth on the witness stand. *State v. Burris,* 145 *N.J.* 509, 530, 679 *A.*2d 121 (1996). When the pre-arrest silence does not involve governmental compulsion, the State may fairly cross-examine defendant concerning his pre-arrest conduct as it bears on his credibility.

In sum, we find no violation of defendant's right to remain silent when the prosecutor questioned defendant concerning his pre-arrest silence and then continued that theme in his summation to the jury. In assessing defendant's self-defense testimony, the jury could infer that a reasonable person in defendant's position, "prior to arrest, would naturally have come forward and mentioned his or her involvement," *Brown, supra,* 118 *N.J.* at 613, 573 *A.*2d 886, and therefore, "the failure to have done so has sufficient probative worth bearing on defendant's credibility for purposes of impeachment." *Id.* at 613–14, 573 *A.*2d 886. On the other hand, the jury could have believed defendant's version of what happened and that his failure to go to the police prior to his arrest was due to his belief that either he had a right to remain silent, or simply that it was not necessary to do so.

We repeat that when there is no governmental compulsion associated with defendant's pre-arrest conduct or silence, when

the defendant testifies at trial, and when the objective circumstances demonstrate that a reasonable person in defendant's position would have acted differently, the State may attempt to impeach defendant on that pre-arrest conduct or silence. Further, when the circumstances warrant the admission of such evidence, the trial court should instruct the jury that the evidence of defendant's pre-arrest conduct or silence is admitted for the limited purpose of impeaching defendant's credibility and that it cannot be used as evidence of defendant's guilt.[1] Thus, with a proper limiting instruction, the jury may determine whether the evidence of defendant's pre-arrest conduct or silence affects his credibility.

## IV.

There remain the questions of the trial court's failure to give a limiting instruction and the prosecutor's submission of evidence of defendant's pre-arrest silence in the State's main case before defendant testified. We address the latter issue first.

## A.

The prosecutor, in questioning Detective Schmeltzly in the State's case-in-chief, inquired if defendant ever contacted the Phillipsburg Police Department between September 12, 2002, the date of the incident, and August 2003, when he was arrested. Detective Schmeltzly replied that defendant had not contacted the police. Detective Schmeltzly also said he was not aware of any charges defendant filed as a victim during that time.

We are satisfied that it was error to admit that evidence in the State's case-in-chief. Although defendant had indicated he would

---

[1] To the extent that *State v. Dreher*, 302 *N.J.Super.* 408, 470, 695 *A.2d* 672 (App.Div.1997) may be read to hold that evidence of pre-arrest silence may be used as substantive evidence of guilt and "for any relevant purpose regardless of whether the defendant takes the stand," *id.* at 478, 695 *A.2d* 672, we disapprove of that holding.

raise self-defense as a defense, defendant still had the right not to testify. Until defendant offered his evidence of self-defense, it was inappropriate to offer that impeaching evidence. Once defendant testified, however, because the objective circumstances were such that a reasonable person in defendant's position would have acted differently, it was proper for the State to cross-examine him and offer rebuttal testimony to impeach defendant's pre-arrest conduct or silence. Thus, Detective Schmeltzly's testimony would have been appropriate as impeachment evidence if it had been offered in rebuttal. Further, the testimony offered by the State in its main case was brief, and the evidence against defendant was substantial. Therefore, we are satisfied that the untimely admission of the impeachment evidence in the State's case-in-chief was not "clearly capable of producing an unjust result." R. 2:10-2.

## B.

Lastly, we address the failure to provide an instruction to limit the use of the pre-arrest conduct and silence evidence solely for impeachment purposes. Because defendant raised the failure to provide a limiting instruction for the first time on appeal, we consider it under the plain error rule. R. 2:10-2. We may reverse on the basis of unchallenged error if we find the error was "clearly capable of producing an unjust result." R. 2:10-2.

"Plain error in the context of a jury charge is '[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result.' " State v. Torres, 183 N.J. 554, 564, 874 A.2d 1084 (2005) (citation omitted). We must read the charge "as a whole in determining whether there was" plain error. Ibid.

Considering the charge as a whole, we find no plain error. Defendant testified that he hit Russell on the head with a bottle in self-defense. The prosecutor's questions concerning defendant's pre-arrest conduct or silence were intended to impeach defen-

dant's story and assist the jury in evaluating the credibility of defendant's self-defense testimony. Consequently, the failure to give a charge that limited the jury's use of defendant's pre-arrest conduct or silence to assess defendant's credibility was not "clearly capable of producing an unjust result." *R.* 2:10–2.

## V.

The judgment of the Appellate Division is affirmed.

Justice ALBIN, dissenting.

New Jersey's common law privilege against self-incrimination guarantees every person the "right to refuse to disclose . . . to a police officer . . . any matter that will incriminate him." *N.J.S.A.* 2A:84A–19; *N.J.R.E.* 503. Today's ruling renders that long-standing privilege a hollow right unless one is in police custody or under official interrogation. The majority's opinion instructs a person facing an impending criminal charge that he first must give his exculpatory account to the police—the very people likely to make a case against him—or else be condemned at trial for not doing so if he testifies at his trial. Under the regime affirmed by the majority, the prosecutor is allowed to argue at trial that a testifying defendant should not be believed because he did not speak to the police at the earliest opportunity before his arrest—in other words, a testifying defendant should be convicted because of his earlier silence. Because this paradigm makes a sham of the right to remain silent and runs contrary to the plain language and intent of our State privilege against self-incrimination, I respectfully dissent.

## I.

I fully appreciate that the majority is following lock step our decision in *State v. Brown,* 118 *N.J.* 595, 613, 573 *A.*2d 886 (1990), and I cannot disagree that the reasoning of *Brown,* if followed, commands the result in this case. However, because I believe that *Brown*'s interpretation of our State privilege against self-

incrimination is not just deeply flawed but wrong, I also believe that this Court is not bound to adhere blindly to the dictates of *stare decisis.*[1]

Both the United States Supreme Court and our Court have recognized that *stare decisis,* standing alone, is not a sufficient reason to uphold an incorrect interpretation of law. Although "[t]he doctrine of *stare decisis* is essential to the respect accorded to the judgments of the Court and to the stability of the law, [i]t is not ... an inexorable command." *Lawrence v. Texas,* 539 *U.S.* 558, 577, 123 *S.Ct.* 2472, 2483, 156 *L.Ed.*2d 508, 525 (2003) (reversing seventeen-year precedent); *see also Payne v. Tennessee,* 501 *U.S.* 808, 828, 111 *S.Ct.* 2597, 2609, 115 *L.Ed.*2d 720, 737 (1991) ("*Stare decisis* is not an inexorable command; rather, it 'is a principle of policy and not a mechanical formula of adherence to the latest decision.' " (quoting *Helvering v. Hallock,* 309 *U.S.* 106, 119, 60 *S.Ct.* 444, 451, 84 *L.Ed.* 604, 612 (1940))) (italics added). Significantly, the United States Supreme Court has recognized that considerations favoring the application of the doctrine of "*stare decisis* are at their acme in cases involving property and contract rights" and that "the opposite is true in cases ... involving procedural and evidentiary rules." *Payne, supra,* 501 *U.S.* at 828, 111 *S.Ct.* at 2610, 115 *L.Ed.*2d at 737.

Similarly, New Jersey courts have not viewed *stare decisis* as an inflexible principle of law. Chief Justice Vanderbilt observed in his dissent in *Fox v. Snow,* 6 *N.J.* 12, 23, 76 *A.*2d 877 (1950): "The doctrine of *stare decisis* [does not] render[ ] the courts impotent to correct their past errors.... The doctrine when

---

[1] I do not find the majority's adherence to *stare decisis* anymore persuasive by its reliance on *State v. Burt,* 59 *N.J.* 156, 279 *A.*2d 850 (1971), *cert. denied,* 404 *U.S.* 1047, 92 *S.Ct.* 728, 30 *L.Ed.*2d 735 (1972). In *Burt,* the Court in a per curiam opinion affirmed the Appellate Division's upholding of the use of pre-arrest silence for impeachment purposes. *Ibid.; see also State v. Burt,* 107 *N.J.Super.* 390, 391–93, 258 *A.*2d 711 (App.Div.1969). *Burt, supra,* contained no extensive analysis of the issue. 59 *N.J.* at 156, 279 *A.*2d 850. Thus, in *Brown,* decided just seventeen years ago, this Court for the first time addressed the issue of the use of pre-arrest silence to impeach a testifying defendant.

properly applied operates only to control change, not to prevent it." We have followed that pragmatic approach. *White v. Township of N. Bergen*, 77 *N.J.* 538, 550–52, 391 *A.*2d 911 (1978) (noting acceptance of "Vanderbilt thesis"); *see also State v. Int'l Fed'n of Prof'l and Technical Eng'rs., Local 195*, 169 *N.J.* 505, 534, 780 *A.*2d 525 (2001) (acknowledging importance of *stare decisis*, but declaring that "this Court must not abdicate its responsibility to reevaluate the rules of the common law to determine if those rules remain in consonance with society's needs").

## II.

With those principles in mind, a review of the rationale of *Brown*, which is the majority's guiding precedent, is now required. In that case, the State prosecuted codefendants Brown and Emm for vehicular homicide as the result of a fatal accident that followed their roadway duel. *Brown, supra*, 118 *N.J.* at 600, 573 *A.*2d 886. Brown struck a car traveling in the opposite lane of traffic, killing the innocent motorist and severely injuring himself. *Ibid.* Without stopping, Emm proceeded to a nearby firehouse, where he served as a volunteer firefighter, reported the accident, and then returned to the scene to render assistance. *Id.* at 602, 573 *A.*2d 886. At the scene, Emm did not advise any of the investigating police officers of his involvement in the accident. *Id.* at 602–03, 573 *A.*2d 886. Two days later, after learning that the police were looking for the "other" car, Emm reported to the police and gave a statement, explaining that Brown had been tailgating him and attempting to run him off the road immediately before the tragic accident. *Id.* at 603, 573 *A.*2d 886. That exculpatory account, basically, was the one given by Emm when he testified at trial. *State v. Brown*, 228 *N.J.Super.* 211, 217, 549 *A.*2d 462 (App.Div.1988), *rev'd*, 118 *N.J.* 595, 573 *A.*2d 886 (1990).

At trial, the prosecutor impeached Emm with his silence at the scene—his pre-arrest silence—and asked the jury to disbelieve Emm because of his failure to give his version to the police at the earliest opportunity. *Brown, supra*, 118 *N.J.* at 609–10, 573 *A.*2d

886. That strategy apparently worked because Emm was convicted. *Id.* at 603, 573 *A.*2d 886.

In upholding Emm's conviction, the Court concluded that "pre-arrest silence may be admitted for impeachment purposes provided no governmental compulsion is involved." *Id.* at 613, 573 *A.*2d 886. In reaching that result, the Court followed *Jenkins v. Anderson*, 447 *U.S.* 231, 100 *S.Ct.* 2124, 65 *L.Ed.*2d 86 (1980), which held that under the Fifth Amendment pre-arrest silence is admissible to impeach a testifying defendant. *Brown, supra,* 118 *N.J.* at 610–13, 573 *A.*2d 886. In *Brown,* the Court maintained that it was for the jury to infer whether "a reasonable person situated as [Emm] . . . would naturally have come forward and mentioned his . . . involvement" to the investigating police officers at the scene. *Id.* at 613, 573 *A.*2d 886. Because Emm was neither interrogated by the police nor in custody at the accident scene, the Court viewed his silence as probative, allowing the jury to draw "an inference of consciousness of guilt that bears on the credibility of the defendant when measured against the defendant's apparent exculpatory testimony." *Id.* at 613, 615, 573 *A.*2d 886.

As we recently noted in *State v. Muhammad,* "[c]onspicuously missing from the [*Brown*] Court's list of possible reasons for Emm's silence was that Emm might simply have been exercising the right not to incriminate himself." 182 *N.J.* 551, 572 n. 7, 868 *A.*2d 302 (2005). Based on the *Brown* Court's crabbed view of this State's privilege against self-incrimination, Emm "had the Hobson's choice of either speaking to the police at the scene and incriminating himself or invoking his right to remain silent, in which case his silence could be used against him." *Ibid.* By the reckoning of *Brown,* without the assistance of counsel and without any legal training, Emm had to calculate whether to condemn himself by his own words or by his silence.

Those are choices, I thought, our State privilege spared our citizens out of our abiding sense of the dignity of the individual. Forcing a person to be a witness against himself, to utter words from his own lips that might seal his fate, I thought, was contrary

to our common notions of fair-play and was the very reason for the protection of the privilege. The construct approved by the majority sanctions compelled, pre-arrest self-incrimination. It is difficult to comprehend how such a coercive rule does not constitute governmental compulsion. When we devise a rule instructing a citizen that if he does not speak to the police he will later at trial be impaled on his silence—that is legal compulsion as effective as the most creative, third-degree interrogation technique. I do not see why compelled self-incrimination is any less noxious in the pre-arrest as opposed to the post-arrest stage.

The illogic of the *Brown* construct is fully realized when one considers that if a police officer had only initiated interrogation of Emm at the accident scene, Emm lawfully could have asserted his right to remain silent and no negative inference could later have been drawn at trial. However, because the police did not begin questioning him, Emm was required under *Brown* to voluntarily incriminate himself or later be incriminated by his silence. Defendant in this case faced a similar dilemma, except unlike Emm he had criminal charges filed against him during his pre-arrest silence period. Thus, under the majority's opinion, defendant had to choose either to turn himself in and speak to the same people bent on prosecuting him or later be impeached with his silence, which ultimately happened.

In his dissent in *Jenkins, supra*, Justice Marshall, joined by Justice Brennan, presented powerful reasons why pre-arrest silence violated the Fifth Amendment's prohibition on self-incrimination, reasons which are applicable with equal if not greater force under our statutory privilege. 447 *U.S.* at 246, 100 *S.Ct.* at 2133, 65 *L.Ed.*2d at 99–100 (Marshall, J., dissenting). As Justice Marshall observed, to penalize a defendant for his pre-arrest silence, unfairly burdens the exercise of the privilege against self-incrimination. *Id.* at 250, 100 *S.Ct.* at 2135, 65 *L.Ed.*2d at 102. "In practical effect, it replaces the privilege against self-incrimination with a duty to incriminate oneself." *Ibid.* He forcefully illustrated

the absurdity of allowing the use of pre-arrest silence in deroga-
tion of the Fifth Amendment, stating:

> [I]f [a defendant] may later want to take the stand, he had better go to the police
> station right away to preserve his exculpatory explanation of the events—even
> though in so doing he must incriminate himself, he may anticipate that his right to
> testify in his own defense will be undermined by the argument that his story is
> probably untrue because he did not volunteer it to the police at the earliest
> opportunity. All of these strategic decisions must be made before the individual
> even knows if he will be charged and of what offense he will be accused.
>
> To force persons to make this kind of choice between two fundamental rights
> places an intolerable burden on the exercise of those rights.
>
> [*Id.* at 253–54, 100 *S.Ct.* at 2137, 65 *L.Ed.*2d at 104.]

## III.

The United States Supreme Court in *Jenkins* presented this
Court with the invitation to provide greater protection for pre-
arrest silence under our statutory privilege than is conferred by
the Federal Constitution. *Id.* at 240–41, 100 *S.Ct.* at 2130, 65
*L.Ed.*2d at 96 (majority opinion). Specifically, the Court noted
that its holding "d[id] not force any state court to allow impeach-
ment through the use of pre-arrest silence" and that each state
was "free to formulate [its own] evidentiary rules" to handle such
situations. *Ibid.* In my opinion, our Court should not have reject-
ed the invitation to interpret our State privilege more broadly
than the *Jenkins* interpretation of the Fifth Amendment.

Justice Brennan encouraged state courts to look to their own
state constitutions as a source of rights more expansive than those
federal rights recognized by the United States Supreme Court.
*See* William J. Brennan, Jr., *The Bill of Rights and the States:
The Revival of State Constitutions as Guardians of Individual
Rights,* 61 *N.Y.U. L.Rev.* 535, 551 (1986) ("As tempting as it may
be to harmonize results under state and national constitutions, our
federalism permits state courts to provide greater protection to
individual civil rights and liberties if they wish to do so."); *see also
In re Grand Jury Proceedings of Guarino,* 104 *N.J.* 218, 229, 516
*A.*2d 1063 (1986) ("It is undisputed that State common law may
provide greater protection to individual rights than afforded under

the United States Constitution."). Indeed, this Court has recognized that our common-law privilege against self-incrimination, as codified both in *N.J.S.A.* 2A:84A–19 and *N.J.R.E.* 503 "offers broader protection than its federal counterpart." *Muhammad, supra,* 182 *N.J.* at 568, 868 *A.*2d 302; *see also Guarino, supra,* 104 *N.J.* at 229, 516 *A.*2d 1063 ("In the past, we have held that the New Jersey common law privilege against self-incrimination affords greater protection to an individual than that accorded under the federal privilege.").

The textual differences alone between the plain language of the Fifth Amendment and our State privilege suggest that the two privileges do not require similar interpretations. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." *U.S. Const.* amend. V. Our privilege, on the other hand, states that "every natural person has a right to refuse to disclose in an action or to a police officer or other official any matter that will incriminate him." *N.J.S.A.* 2A:84A–19; *N.J.R.E.* 503. The federal guarantee is spoken in negative terms while the State guarantee is spoken in positive terms. Moreover, our privilege does not speak expressly in terms of compulsion. Even though this Court in *Brown, supra,* read the language of our rule to "suggest[ ] that the right to remain silent might exist only in the face of a compulsion to speak," that result does not follow from the words of our privilege. 118 *N.J.* at 612, 573 *A.*2d 886.

Accordingly, not only is this Court free to chart its own course, but it is our duty to do so "when our state's interests are not advanced by federal precedent." *State v. Stanton,* 176 *N.J.* 75, 118, 820 *A.*2d 637 (2003) (Albin, J., dissenting) ("In interpreting our State Constitution, particularly [if the provision is textually different], a decision of the United States Supreme Court is *persuasive* authority only if it can *persuade* by force of reason, logic, and historical interpretation.").

The majority has pointed out that there is currently a split among other states about whether pre-arrest silence can be used

for impeachment purposes. *Ante* at 157, 919 *A.*2d at 115. It may also be true that allowing such evidence is the slightly more popular view. *See generally* John H. Derrick, Annotation, *Impeachment of Defendant in Criminal Case by Showing Defendant's Prearrest Silence—State Cases,* 35 *A.L.R.*4th 731 (1985). However, as we have recently stated: "In protecting the rights of citizens of this State, we have never slavishly followed the popular trends in other jurisdictions, particularly when the majority approach is incompatible with the unique interests, values, customs, and concerns of our people." *Lewis v. Harris,* 188 *N.J.* 415, 456, 908 *A.*2d 196 (2006).

While a member of this Court, Justice Brennan commented that the privilege against self-incrimination, in its modern incarnation, "rest[s] on the view that compelling a person to convict himself of crime is 'contrary to the principles of free government' and 'abhorrent to the instincts'" of our citizens. *In re Pillo,* 11 *N.J.* 8, 15–16, 93 *A.*2d 176 (1952) (quoting *Boyd v. United States,* 116 *U.S.* 616, 632, 6 *S.Ct.* 524, 533, 29 *L.Ed.* 746, 751 (1886)). The case in favor of using pre-arrest silence, even for impeachment purposes, runs contrary to those sentiments. Ultimately, the majority's only reason for continuing the use of pre-arrest silence is because we have sanctioned that practice before. *See ante* at 157–58, 919 *A.*2d at 115–16 ("Regardless of whether we would agree ... that pre-arrest silence may be admitted for impeachment purposes when no governmental compulsion is involved if we were addressing the issue for the first time, we are obliged to follow them under principles of *stare decisis.*").

*Stare decisis* is not a command to repeat the mistakes of the past. Before us is a case that would allow us to adjust our decisional law in a direction consistent with our progressive jurisprudence. Because the majority has failed to grasp this opportunity to give our State evidentiary privilege the meaning expressed in its words, I respectfully dissent.

Justice LONG joins in this opinion.

*For affirmance*—Chief Justice ZAZZALI and Justices LaVECCHIA, WALLACE, RIVERA–SOTO and HOENS—5.

*For reversal*—Justices LONG and ALBIN—2.