NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-5592-14T2

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

RICHARD WHATLEY,

 Defendant-Appellant.
______________________________________________

 Submitted May 31, 2017 – Decided July 18, 2017

 Before Judges Messano and Suter.

 On appeal from the Superior Court of New
 Jersey, Law Division, Essex County, Indictment
 No. 13-12-3038.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Susan Brody, Deputy Public
 Defender, of counsel and on the brief).

 Carolyn A. Murray, Acting Essex County
 Prosecutor, attorney for respondent (Barbara
 A. Rosenkrans, Special Deputy Attorney
 General/Acting Assistant Prosecutor, of
 counsel and on the brief).

PER CURIAM

 Tried by a jury, defendant Richard Whatley was convicted of

the lesser-included offense of second-degree passion-provocation
manslaughter, N.J.S.A. 2C:11-4(b)(2), and second-degree unlawful

possession of a handgun, N.J.S.A. 2C:39-5(b). The judge sentenced

defendant to a ten-year period of imprisonment, with an 85% period

of parole ineligibility under the No Early Release Act (NERA),

N.J.S.A. 2C:43-7.2, on the manslaughter conviction. He imposed a

consecutive eight-year term with a mandatory four-year period of

parole ineligibility under the Graves Act, N.J.S.A. 2C:43-6(c),

on the weapons charge.

 Defendant raises the following issues on appeal:

 POINT I

 THE COURT'S PURPORTED LIMITING INSTRUCTION AS
 TO TAYLOR KENNEDY'S REBUTTAL TESTIMONY FAILED
 TO IDENTIFY THE SOLE LEGITIMATE PURPOSE FOR
 WHICH THE TESTIMONY COULD BE CONSIDERED OR TO
 INSTRUCT THAT IT COULD NOT BE USED FOR ANY
 OTHER PURPOSE, THUS GREATLY PREJUDICING
 DEFENDANT'S RIGHT TO A FAIR TRIAL. (Not Raised
 Below)

 POINT II

 THE PROSECUTOR COMMITTED MISCONDUCT IN A
 NUMBER OF INSTANCES THROUGHOUT THE TRIAL.

 A. The Prosecutor Impermissibly Bolstered the
 Credibility Of the Lead Detective by
 Questioning Him as to Why He Sought Charges
 Against Defendant At the Time He Did.

 B. The Prosecutor Repeatedly Emphasized to the
 Jury That Shaquanah Williams Was Fearful of
 Retaliation For her Testimony, Strongly
 Implying That Her Fear was Justified.

 2 A-5592-14T2
 C. The Prosecutor's Summation Included A
 Crucial Statement That Was Based on
 Information Not Found In The Record And That
 Was Factually Inaccurate.

 D. The Prosecutor Overstepped the Bounds of
 Permissible Questioning in His Cross-
 Examination of [Defendant] About His Failure
 to Go to Police with His Self-Defense Claim.

 POINT III

 THE COURT ERRED IN IMPOSING A CONSECUTIVE
 SENTENCE ON THE WEAPON POSSESSION CHARGE AND
 IN IMPOSING A MANIFESTLY EXCESSIVE TERM ON
 EACH CHARGE.

We have considered these arguments, in light of the record and

applicable legal standards. We affirm.

 I.

 We briefly summarize the evidence adduced at trial, limited

to that which is necessary to place defendant's legal arguments

in proper context.

 On May 27, 2013, the Kennedy family hosted a barbecue for

family and friends at their home in Newark. Rayquan Williamson

organized the annual barbeque and approximately thirty to forty

people were present at various times of the day. Rayquan's younger

sister, Taylor Kennedy, invited defendant and his friend,

identified only as Max, to the barbecue. Toward the end of the

evening, an argument ensued, causing Williamson to escort

defendant and Max out of the party. A derogatory remark aimed at

 3 A-5592-14T2
one of the women at the party led to a physical altercation

involving several people in front of the house.

 Shots rang out. Williamson saw defendant with a small

revolver in his hand. Williamson and his friend briefly followed

defendant and Max as they retreated down the street, with defendant

repeating, "he hit me, he hit me first", and "he popped on me."

Williamson heard police sirens, turned back to the house and found

Teshon Clegg, a close family friend who lived nearby and was at

the party, laying lifeless in the street. Clegg died of a single

gunshot wound to the chest.

 Williamson's sister, Janeal Ferguson, said Max instigated the

trouble, and defendant was relatively calm during the party and

as he and Max were leaving. As the melee ensued in front of the

house, Ferguson saw Clegg strike defendant and pin him against a

parked car. She went into the backyard to clean up because the

party was winding down and heard two gunshots. When she ran to

the front of the house, Clegg was laying in the street several

houses away.

 Shaquanah Williams was Williamson's girlfriend. While at the

barbecue, she overheard defendant say he had a "pocket rocket," a

slang term for a gun. She told Williamson she was leaving because

she was "scared" and knew "somebody had a gun on them." Williams

was about to get into her car when she saw Williamson "tussling

 4 A-5592-14T2
with Max." As she moved toward them, Williams saw defendant fire

two shots in Clegg's direction.

 A neighbor, who did not identify defendant in court, testified

to seeing a man with a white shirt pointing a gun in the direction

of the crowd and hearing two shots. Other witnesses testified

that defendant was wearing a white shirt. The neighbor called

9-1-1 after hearing Clegg scream that he was shot.

 The police witnesses described a hectic scene when they

responded, with fifty or sixty people milling around. Police

found a .22 caliber bullet at the scene, which was fired from the

same gun as the bullet removed from Clegg's body at autopsy.

Police conducted an investigation and attempted, unsuccessfully,

to locate defendant. On June 11, 2013, police issued a warrant

for defendant's arrest. Defendant turned himself into authorities

on June 17, 2013.

 Defendant testified. He stated Max began an argument with a

woman at the party, which soon escalated into a melee, during

which Clegg punched defendant in the head and tackled him to the

ground. Defendant denied having a gun that evening, but, instead,

claimed Clegg had a gun, which fell to the ground and discharged

as Clegg lifted up his shirt to display the weapon. Both men

grabbed for the gun, but defendant retrieved it. When Clegg tried

to grab defendant's hand, a second round discharged.

 5 A-5592-14T2
 Clegg ran off before collapsing. Defendant still had the gun

in his hand as the crowd started to surround him. He ran off,

throwing the gun in a manhole before arriving at his cousin's

house. When asked why he threw the gun away, defendant testified,

"I'm not used to walking around carrying guns. That's not . . .

what I do. That's not the life that I live." Defendant's family

arranged for him to surrender after learning about the arrest

warrant.

 During cross-examination, the prosecutor repeatedly asked

defendant if he went to the police on the night of the shooting

or any time prior to the issuance of the arrest warrant. Most of

these questions prompted no objection. However, when the

prosecutor asked if anything "prevented [defendant] from telling"

police his version of events on June 17, 2013, the day he

surrendered, defense counsel's objection prompted an extended

legal argument outside the presence of the jury, during which

defense counsel moved for a mistrial.1

 The judge denied defendant's mistrial motion, ordered the

prosecutor to cease questioning defendant about his pre-arrest

silence, and, when the proceedings reconvened, the judge gave the

1
 Over defendant's objection, the prosecutor had earlier asked one
of the detectives, Eric Manns, if he had taken a statement from
defendant when defendant surrendered. The detective responded in
the negative.

 6 A-5592-14T2
following instruction to the jury: "A defendant's silence, while

in custody, under interrogation, or at or near the time of his

arrest, cannot be used against him." Defendant did not object to

the charge nor ask for any additional instruction.

 Defendant's cousin also testified. When he saw defendant

late in the evening of May 27, defendant was "shaken up," "scared"

and "frantic". Defendant told his cousin he had been in an

altercation with another person, who was unintentionally shot when

both men reached for a gun.

 The prosecutor called Taylor Kennedy as a rebuttal witness.

She had known defendant for about a year and spent time with him

nearly every day. Toward the end of the barbecue, Kennedy heard

gunshots and saw defendant holding a silver "little cowboy gun,

like a revolver." Kennedy testified that she saw defendant with

the same gun on a prior occasion at Max's house, although she was

vague about exactly when this occurred. Kennedy stated that

defendant grew angry with others in the house on that day and

fired the gun into the ceiling.

 After several days of deliberations, the jury returned the

guilty verdicts referenced above and acquitted defendant of

possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-

4(a).

 7 A-5592-14T2
 II.

 Although we have not been provided with transcripts of any

pre-trial proceedings, the judge had apparently barred the State

from introducing evidence of defendant's possession of a gun prior

to the shooting. However, after defendant testified that he never

possessed a gun, had a general aversion to them and the gun

belonged to Clegg, the prosecutor sought to call Kennedy as a

rebuttal witness.

 After conducting a N.J.R.E. 104 hearing and over defendant's

objection, the judge concluded defendant's testimony had "opened

the door." He conducted an analysis pursuant to State v. Cofield,

127 N.J. 328 (1992), and agreed to permit Kennedy's testimony.

 The judge provided the jury with the following limiting

instruction, which included defense counsel's specific suggestions

and which defense counsel ultimately approved:

 [T]he State has just introduced evidence that
 the defendant allegedly possessed a handgun
 at a date prior to May 27th, 2013, the date
 of the alleged murder.

 Normally such evidence is not permitted
 under our rules of evidence. Our rules
 specifically exclude evidence that a defendant
 has committed other crimes, wrongs or acts
 when it is offered only to show that he has a
 disposition or tendency to do wrong, and
 therefore must be guilty of the charged
 offenses. Before you give any weight to this
 evidence, you must be satisfied that the –-
 that the defendant committed the other crime,

 8 A-5592-14T2
wrong, or act. If you are not so satisfied,
you may not consider it for any purpose.

 However, our rules do permit evidence of
other crimes, wrongs, or acts when the
evidence is used for certain specific, narrow
purposes.

 In this case, the State has introduced
evidence that the defendant allegedly
possessed a handgun at a date prior to May
27th, 2013, the date of the alleged homicide,
to show absence of mistake or accident as to
whether the defendant allegedly possessed a
handgun on the evening of May 27th, 2013. The
State contends that the defendant possessed a
handgun on May 27th, 2013; whereas the defense
contends that the decedent, Teshon Clegg, was
the one who allegedly possessed the handgun
on May 27th, 2013, just prior to Mr. Clegg
being shot.

 Whether this evidence does in fact
demonstrate the absence of mistake or accident
it is for you to decide. You may decide that
the evidence does not demonstrate the absence
of mistake or accident and is not helpful to
you at all. In that case, you must disregard
the evidence. On the other hand, you may
decide that the evidence does demonstrate the
absence of mistake or accident and use it for
that specific purpose.

 However, you are not –- however, you may
not use this evidence to decide that the
defendant has a tendency to commit crimes or
that he is a bad person. That is, you may not
decide that just because the defendant had
committed other crimes, wrongs, or acts, he
must be guilty of the present crime. I have
admitted the evidence only to help you decide
the specific question of the absence of
mistake or accident. You may not consider it
for any other purpose and you may not find the
defendant guilty now simply because the State

 9 A-5592-14T2
 has offered evidence that he committed other
 crimes, wrongs, or acts.

The judge reiterated the limiting instruction during the final

jury charge.

 Defendant now argues the limiting instruction was "erroneous,

misleading and inadequate," because he never contended he

possessed the gun "by mistake or accident." Rather, the only

point of Kennedy's testimony was to identify the murder weapon as

a revolver belonging to defendant, not Clegg. Defendant argues

the erroneous instruction, therefore, permitted the jury to use

the evidence to impeach his credibility, which, he argues, was

impermissible. We find these arguments unpersuasive.

 Initially, defendant's argument that N.J.R.E. 404(b) evidence

is not admissible to impeach the credibility of his trial testimony

is plainly wrong. He cites State v. Skinner, 218 N.J. 496 (2014),

but that reliance is misplaced. There, the Court repeated its

discouragement of "the use of other-crime evidence merely to

bolster the credibility of a testifying witness." Id. at 520

(emphasis added). Rather, this case is more like State v. Lykes,

192 N.J. 519 (2007). There, the Court concluded questioning about

the "defendant's prior involvement with a vial of cocaine was

relevant to the jury's assessment of defendant's credibility when

 10 A-5592-14T2
he testified that he did not know what was in the vial." Id. at

537.

 Moreover, Kennedy's testimony was relevant to prove a

contested fact at trial, not just to impeach defendant's testimony.

The State's witnesses claimed defendant had the gun and shot Clegg.

Defendant asserted Clegg's shooting was unintentional, i.e., an

accident or mistake. The charge accurately focused the jury's

attention on the relevancy of Kennedy's testimony as to defendant's

prior possession of the very same gun.

 In short, the instruction as given was not plain error. See,

e.g., State v. Brown, 190 N.J. 144, 160 (2007) ("Plain error

. . . is [l]egal impropriety in the charge prejudicially affecting

the substantial rights of the defendant sufficiently grievous to

justify notice by the reviewing court and to convince the court

that of itself the error possessed a clear capacity to bring about

an unjust result." (quoting State v. Torres, 183 N.J. 554, 564

(2005))).

 III.

 Defendant argues the prosecutor's misconduct requires

reversal. While prosecutors are entitled to zealously argue the

merits of the State's case, State v. Smith, 212 N.J. 365, 403

(2012), cert. denied, ___ U.S. ___, 133 S. Ct. 1504, 185 L. Ed.

2d 558 (2013), they occupy a special position in our system of

 11 A-5592-14T2
criminal justice. State v. Daniels, 182 N.J. 80, 96 (2004). "[A]

prosecutor must refrain from improper methods that result in a

wrongful conviction, and is obligated to use legitimate means to

bring about a just conviction." Ibid. (quoting State v. Smith,

167 N.J. 158, 177 (2001)). Even if the prosecutor exceeds the

bounds of proper conduct, "[a] finding of prosecutorial misconduct

does not end a reviewing court's inquiry because, in order to

justify reversal, the misconduct must have been 'so egregious that

it deprived the defendant of a fair trial.'" Smith, supra, 167

N.J. at 181 (quoting State v. Frost, 158 N.J. 76, 83 (1999)).

 In Points IIA and IID, the arguments involve the prosecutor's

direct examination of Detective Manns and cross-examination of

defendant. The contentions made in Points IIB and IIC relate to

the prosecutor's summation. We find none of the objected to

conduct, singly or collectively, requires reversal.

 A.

 Defendant argues the prosecutor improperly questioned

Detective Manns by asking why the detective did not issue an arrest

warrant immediately after the shooting, even though defendant was

a "target" as of May 28. Defendant contends the testimony

bolstered the credibility of Detective Manns, was largely

irrelevant and was highly prejudicial.

 In particular, defendant objects to the following exchange:

 12 A-5592-14T2
 Prosecutor: Why did you seek charges in this
 case?

 Detective: I seeked [sic] charges on June
 11th, because . . . I had enough evidence to
 charge [defendant]. . . . [A]s a police
 detective, I was satisfied that there was
 enough evidence from enough witnesses to
 charge [defendant].

Defense counsel immediately objected on relevancy grounds, and,

before the court ruled, the prosecutor agreed to "stop" the

detective "right there."

 We agree this exchange was improper, because it implied police

had sufficient evidence to conclude defendant committed the

homicide. See, e.g., State v. Frisby, 174 N.J. 583, 592-96 (2002)

(explaining impropriety of police testimony regarding opinions

formed during investigation as to credibility of witnesses). We

are convinced, however, that this exchange does not require

reversal.

 As the Court has explained:

 [A] trial is not a perfectly scripted and
 choreographed theatrical presentation;
 rather, it is an extemporaneous production
 whose course is often unpredictable given the
 vagaries of the human condition. Attorneys
 will sometimes pose inartfully crafted
 questions, and even the most precise question
 may bring an unexpected response from a
 witness. In any trial, "inadmissible evidence
 frequently, often unavoidably, comes to the
 attention of the jury."

 13 A-5592-14T2
 [State v. Yough, 208 N.J. 385, 397 (2011)
 (quoting State v. Winter, 96 N.J. 640, 646
 (1984)).]

Here, defense counsel objected and, before the judge could sustain

the objection, the prosecutor ceased further questioning.

 Moreover, we disagree with defendant's contention that the

prosecutor's questioning leading up to this exchange was

irrelevant or bolstered the detective's credibility. From the

prosecutor's opening statement, the State contended defendant fled

the scene and could not be located for nearly three weeks after

the shooting, implying the jury should ultimately reject

defendant's version of events. The detective's earlier testimony

detailed the efforts made to find defendant after the shooting.

The judge charged flight in his final jury instructions. In short,

while some of the testimony was improper, its admission does not

require reversal. See id. at 397-98 ("[W]hen inadmissible evidence

erroneously comes before the jury, an appellate court should not

order a new trial unless the error was 'clearly capable of

producing an unjust result.'" (quoting R. 2:10-2)).

 B.

 Defendant next argues the prosecutor's extensive cross-

examination regarding defendant's failure to voluntarily approach

law enforcement prior to his surrender and provide his version of

events was improper and violated defendant's right to remain

 14 A-5592-14T2
silent. He contends the judge's limiting instruction was

insufficient. We disagree.

 In Brown, supra, 190 N.J. at 148, the Court considered whether

the prosecutor could cross-examine the defendant, who fled after

committing a vicious assault, about his failure to assert that he

acted in self-defense prior to his testimony at trial. The Court

stated that "once the defendant elects to testify, similar to

every other witness, the defendant has an obligation to tell the

truth on the witness stand." Id. at 158 (citing State v. Burris,

145 N.J. 509, 530 (1996)). The Court held "[w]hen the pre-arrest

silence does not involve governmental compulsion, the State may

fairly cross-examine defendant concerning his pre-arrest conduct

as it bears on his credibility." Ibid. "[W]hen the objective

circumstances demonstrate that a reasonable person in [the]

defendant's position would have acted differently, the State may

attempt to impeach defendant on that pre-arrest conduct or

silence." Id. at 159.2

2
 The Court also held that the judge "should instruct the jury
that the evidence of defendant's pre-arrest conduct or silence is
admitted for the limited purpose of impeaching defendant's
credibility and that it cannot be used as evidence of defendant's
guilt." Brown, supra, 190 N.J. at 159.
 Here, the judge ultimately ordered the prosecutor to cease
questioning defendant about his pre-arrest silence. After his
mistrial motion was denied, defense counsel did not object to the
instructions given by the judge nor request any further instruction

 15 A-5592-14T2
 Defendant argues Brown was wrongly decided, the circumstances

in this case did not permit a conclusion that it was reasonable

for defendant to have acted differently and the prosecutor's

relentless questioning about his pre-arrest silence was

prejudicial. We are unpersuaded by these arguments.

 The Court reiterated the basic holding of Brown in State v.

Stas, 212 N.J. 37, 58 (2012) ("[P]re-arrest silence that is not

'at or near' the time of arrest, when there is no government

compulsion and the objective circumstances demonstrate that a

reasonable person in a defendant's position would have acted

differently, can be used to impeach that defendant's credibility

with an appropriate limiting instruction."). Defendant claims

that he acted reasonably under the circumstances by not coming

forward because he had received threats on his life immediately

after the shooting. If anything, that cuts the other way, because

a reasonable person who acted in self-defense and only fled the

scene in fear would likely have sought protection from law

enforcement. The prosecutor's cross-examination was extensive,

but much of it elicited no objection, and we defer to the judge's

limiting the use of the testimony to impeachment purposes. We
cannot conclude that the failure to give an instruction limiting
the use of defendant's pre-arrest silence to impeachment purposes
was, in and of itself, plain error. R. 2:10-2.

 16 A-5592-14T2
discretion in matters involving the conduct of the proceedings and

control of cross-examination. N.J.R.E. 611.

 C.

 Defendant argues the prosecutor's summation requires

reversal. "Our task is to consider the fair import of the State's

summation in its entirety." State v. Jackson, 211 N.J. 394, 409

(2012) (internal quotation marks and citation omitted). The

prosecutor is permitted to vigorously rebut specific arguments

made by defense counsel. See State v. Mahoney, 188 N.J. 359, 376-

77 (2006) (holding a "prosecutor's comment[] . . . placed an

unforgiving and harsh glare on defendant's . . . defense" but was

permissible). "Whether particular prosecutorial efforts can be

tolerated as vigorous advocacy or must be condemned as misconduct

is often a difficult determination to make. In every instance,

the performance must be evaluated in the context of the entire

trial . . . ." State v. Negron, 355 N.J. Super. 556, 576 (App.

Div. 2002).

 Defendant argues the prosecutor improperly commented on

defendant's claim that Clegg's gun accidently fired when it hit

the ground by telling jurors, "[G]uns have to be fired. They're

inanimate objects, kind of like this pen. If you don't use them,

they don't work. Somebody pulled that trigger. That gun just

 17 A-5592-14T2
didn't fall and go off." He argues significant academic studies

support the conclusion that guns accidently fire when dropped.

 There was no objection to the prosecutor's comment, and while

it might not be empirically accurate, it invited the jury to make

a reasonable inference that the gun probably did not misfire. In

the scheme of things, the comment was insignificant.

 Defendant's second argument stems from Williams' trial

testimony, during which the judge permitted the prosecutor to ask

her on direct examination why her trial testimony differed from

her prior statement to police. She explained that she was seven

months pregnant at the time, "didn't want to be involved" and told

police she was inside her car because she did not want to testify

in open court. She told jurors she was "fearful."

 In his summation, defense counsel vigorously attacked

Williams' credibility, citing her inconsistent statements. In his

summation, the prosecutor referenced William's demeanor during her

tearful testimony and implied she feared defendant who she saw

"shoot an unarmed man."

 Defendant argues the summation comments implied he was a

dangerous man whose mere presence could intimidate witnesses, even

though there was no proof he had engaged in such conduct. The

comments would have been better stated in more general terms,

since it is an unfortunate reality, not lost on jurors, that

 18 A-5592-14T2
witnesses choose to remain uninvolved for a variety of reasons,

including unspecified fears. However, given the evidence and

considering the summation as a whole, we cannot conclude the

prosecutor's comments denied defendant his right to have the jury

fairly evaluate the evidence against him. See, e.g., State v.

Echols, 199 N.J. 344, 360 (2009) ("Reversal is justified when the

prosecutor['s] . . . conduct was 'so egregious as to deprive

defendant of a fair trial.'" (quoting State v. Wakefield, 190 N.J.

397, 437 (2007), cert. denied, 552 U.S. 1146, 128 S. Ct. 1074, 169

L. Ed. 2d 817 (2008))).

 IV.

 Defendant argues the imposition of consecutive sentences was

inappropriate, and the sentences were excessive. We disagree and

affirm.

 We begin by noting that "[a]ppellate review of the length of

a sentence is limited." State v. Miller, 205 N.J. 109, 127 (2011).

As the Court has reiterated:

 The appellate court must affirm the sentence
 unless (1) the sentencing guidelines were
 violated; (2) the aggravating and mitigating
 factors found by the sentencing court were not
 based upon competent and credible evidence in
 the record; or (3) "the application of the
 guidelines to the facts of [the] case makes
 the sentence clearly unreasonable so as to
 shock the judicial conscience."

 19 A-5592-14T2
 [State v. Fuentes, 217 N.J. 57, 70 (2014)
 (alteration in original) (quoting State v.
 Roth, 95 N.J. 334, 364-65 (1984)).]

Furthermore, "trial judges have discretion to decide if sentences

should run concurrently or consecutively." Miller, supra, 205

N.J. at 128. "When a sentencing court properly evaluates the

Yarbough factors3 in light of the record, the court's decision

3
 The Yarbough factors are:

 (1) there can be no free crimes in a system
 for which the punishment shall fit the crime;
 (2) the reasons for imposing either a
 consecutive or concurrent sentence should be
 separately stated in the sentencing decision;
 (3) some reasons to be considered by the
 sentencing court should include facts relating
 to the crimes, including whether or not:
 (a) the crimes and their objectives
 were predominantly independent of
 each other;
 (b) the crimes involved separate
 acts of violence or threats of
 violence;
 (c) the crimes were committed at
 different times or separate places,
 rather than being committed so
 closely in time and place as to
 indicate a single period of aberrant
 behavior;
 (d) any of the crimes involved
 multiple victims;
 (e) the convictions for which the
 sentences are to be imposed are
 numerous;
 (4) there should be no double counting of
 aggravating factors;

 20 A-5592-14T2
will not normally be disturbed on appeal." Miller, supra, 205

N.J. at 129.

 Here, the judge carefully considered the appropriate

aggravating factors and mitigating factors urged by defense

counsel. He noted that, although defendant was only nineteen when

he committed these crimes and had no prior indictable convictions,

defendant had prior juvenile adjudications and was an self-

acknowledged member of the Bloods street gang. He credited

defendant with certain mitigating factors, but found they were

outweighed by the aggravating factors.

 With respect to imposing consecutive sentences, citing

Yarbough and Miller, the judge stated defendant's unlawful

possession of the handgun was a crime separate from the homicide.4

 (5) successive terms for the same offense
 should not ordinarily be equal to the
 punishment for the first offense[.]

 [State v. Yarbough, 100 N.J. 627, 643-44
 (1985), cert. denied, 475 U.S. 1014, 106 S.
 Ct. 1193, 89 L. Ed. 2d 308 (1986).]

A sixth factor, imposing an overall outer limit on consecutive
sentences, was superseded by legislative action. See State v.
Eisenman, 153 N.J. 462 (1998).
4
 The State argues a consecutive sentence for the firearm
possession was appropriate given defendant's possession of the gun
on a date prior to the shooting. The judge specifically did not
justify the sentence on this ground, and we reject the argument
because defendant was never charged with possession of the handgun
on any day other than the date of the homicide.

 21 A-5592-14T2
He imposed consecutive sentences because "there shall be no free

crimes committed in the system, and . . . these were separate and

independent crimes."

 We accord substantial deference to the trial judge's

decision, both as to the sentences imposed and whether they are

to be served concurrently or consecutively. The judge did not

mistakenly exercise his broad discretion in this regard, and we

find no basis to reverse defendant's sentence.

 Affirmed.

 22 A-5592-14T2