**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4100-16T1

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

SADOT COUNCIL, a/k/a
WATSON SADOT, COUNCIL
SADOT, KAREM A. WATSON,
and SADAT A. WATSON,

     Defendant-Appellant.

_____

Argued November 8, 2018 – Decided July 25, 2019

Before Judges Fuentes, Vernoia and Moynihan.

On appeal from the Superior Court of New Jersey, Law Division, Essex County, Indictment No. 15-08-1859.

Cody T. Mason, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Cody T. Mason, of counsel and on the briefs).

Lucille M. Rosano, Special Deputy Attorney General/ Acting Assistant Prosecutor, argued the cause for respondent (Theodore N. Stephens II, Acting Essex

County Prosecutor, attorney; Lucille M. Rosano, of counsel and on the brief).

Appellant filed a pro se supplemental brief.

PER CURIAM

Defendant Sadot Council appeals from his convictions following a jury trial for murder and weapons offenses and the life sentence imposed by the court. Based on our review of the record in light of the applicable law, we are convinced that the cumulative effect of errors committed during the trial had the probable effect of rendering the trial unfair, and reverse.

I.

On April 28, 2015, Anthony Mayse died after being shot twice at a Newark housing complex. On May 8, 2015, defendant was arrested in connection with the shooting, and later charged in an indictment with one count of first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2) (count one), second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count two), and second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count three).[1]

---

[1] Although not included in the record on appeal, the parties acknowledge and do not dispute that defendant was charged in a separate indictment with second-degree certain persons not permitted to have weapons, N.J.S.A. 2C:39-7(b). The indictment was dismissed at the State's request following defendant's conviction on the charges that are the subject of this appeal.

A-4100-16T1

Prior to trial, defendant moved to suppress the out-of-court identifications made by three purported witnesses to the shooting, Nolie Clark, Jullisa Perna and a then sixteen-year-old juvenile, J.S., and requested a Wade/Henderson[2] hearing. Defendant claimed he was entitled to a hearing because Clark described the shooter as a dark-skinned African-American male but the photo arrays used during the separate identification procedures included photos depicting light-skinned African-American males, and J.S. refused to sign the photograph of defendant she selected during the procedure.

In a written opinion and order, the court denied the request for a hearing, finding defendant failed to demonstrate any evidence of suggestiveness in the photo identification procedures. The court reviewed the photo arrays and determined they included individuals with similar physical characteristics and were not otherwise suggestive. The court rejected the contention that J.S.'s refusal to sign the photograph she selected was evidence of suggestiveness.

During the subsequent jury trial, the State presented evidence showing that on April 28, 2015, Mayse suffered from two gunshot wounds, one of which perforated his heart and caused his death. The shots were fired from a .32 caliber

---

[2] United States v. Wade, 388 U.S. 218 (1967); State v. Henderson, 208 N.J. 208 (2011).

handgun, but it could not be determined if the handgun was a semi-automatic or a revolver.

The identification of defendant as the shooter rested on the testimony of the three purported eyewitnesses: Perna, Clark and J.S. Perna testified she had known defendant and Mayse since 2000. She was close to Mayse and he viewed her as a maternal figure. She let him use her apartment at the housing complex to sell drugs, and he gave her drugs. According to Perna, on the evening prior to the shooting, she witnessed a verbal altercation between defendant and Mayse during which defendant said he would "blow [Mayse's] fucking head off." It was shown, however, that in her June 9, 2015 statement to the police, she reported that defendant said he would "knock [Mayse's] fucking head off, blow his fucking head off, actually."

Perna expected Mayse at her apartment on the morning of April 28, 2015, but he did not appear. In the early afternoon, she was told defendant and Mayse were fighting. She immediately left her apartment and observed defendant riding a bicycle in the direction of his apartment in the complex and then return, again riding on a bicycle. He was not wearing a shirt. She testified defendant had a silver revolver in his hand and that she saw defendant shoot Mayse, but on cross-examination admitted she reported the gun was a black automatic

A-4100-16T1

weapon in a June 9, 2015 statement to the police. After witnessing the shooting, Perna ran back to her apartment.

Perna first spoke to the police more than six weeks after the shooting when she provided her June 9, 2015 statement. On that date she also reviewed a photo array presented by an officer who had no knowledge of the case, selected defendant's photograph and identified him as the individual who shot Mayse.

When the police arrived at the scene of the shooting, Clark told an officer he did not see the shooting because he was around the corner of a building when it occurred. He and J.S. later went together to the hospital where Mayse had been taken. Clark spoke to the police at the hospital and again said he did not witness the shooting.

During a recorded statement with the police two days after the shooting, Clark said he witnessed a physical altercation between Mayse and defendant, and observed defendant leave the scene and return on a bicycle and shoot Mayse twice with a handgun. At trial, Clark testified he could not recall what occurred at the housing complex on April 28, 2015, but the court conducted a Gross[3] hearing, determined his memory loss was feigned, and permitted the State to

---

[3] State v. Gross, 121 N.J. 1 (1990).

play a video recording of the statement he gave to the police on April 30, 2015, two days after the shooting.

In his recorded statement, Clark explained he and Mayse had known each other for two years prior to the shooting. They arrived together at the housing complex prior to the shooting. Following their arrival, Mayse and an individual Clark identified in a photo identification procedure as defendant had a physical altercation. Clark described defendant as a skinny, brown-skinned male with "dreads" who, following the altercation, was not wearing a shirt. Clark further explained that after the physical altercation ended, defendant left the scene on a bicycle, returned a short time later on the bicycle, shot defendant two times and then departed. In his statement, Clark said that after the shooting he was "busy worrying about" Mayse and could not recall if defendant left the scene of the shooting on a bicycle. According to Clark, he and J.S. attempted to aid Mayse after the shooting.

The jury was shown the video recording of Clark's statement, as well as the recording of the photo array identification procedure during which Clark selected defendant's photograph and identified defendant as the shooter. At trial, Clark acknowledged signing defendant's photo and identifying him as the shooter during the photo identification procedure.

J.S. testified she was friends with Mayse and met him at the housing complex when he arrived with Clark on April 28, 2015. She also testified that Mayse and a person she identified as defendant during a photo identification procedure had a physical altercation. She observed defendant leave the scene of the altercation on a bicycle, return a short time later on the bicycle and shoot defendant with what she described as a .32 caliber silver revolver. J.S. said defendant was not wearing a shirt.

She acknowledged that when she spoke to the police on April 28, 2015, immediately after the shooting, she said she did not see the shooting. She testified she denied seeing the shooting at that time because she feared being identified as a "snitch."

J.S. identified defendant as the shooter on April 29, 2015, by selecting his photo from an array of six photographs shown to her by a police detective who had no prior knowledge concerning the case or investigation. The recorded photo identification procedure was played for the jury. During the trial, J.S. also identified defendant in still photographs taken from a surveillance video of the area surrounding the scene of the murder immediately before and after the murder. The shooting, however, was not captured on the surveillance recordings.

7

Essex County Prosecutor's Office Detective Bruce Branch, the lead detective in the investigation of Mayse's murder, detailed the investigation, including his review of various surveillance camera video recordings of the housing complex areas where the physical altercation and murder occurred. Detective Branch explained that murder charges were filed against defendant on May 1, 2015, and defendant was arrested on May 8, 2015, after turning himself in to the police.

The State presented other witnesses, including Dr. Andrew Falzon, the State Medical Examiner, who testified Mayse died as a result of the perforation of his heart and internal bleeding from one of the gunshot wounds. He also testified Mayse was struck by another gunshot, but it caused only soft tissue injuries. A ballistics expert testified that the two bullets recovered from Mayse's body were fired from a .32 caliber handgun, but it could not be determined if the gun was a revolver or semi-automatic.

Defendant called Newark Police Officer Edwin Padilla. He testified he was dispatched to the scene of the shooting. When Padilla arrived, he observed Clark providing aid to Mayse. Padilla explained Clark denied seeing the shooting and said that after the shooting he observed a group of males running away.

A-4100-16T1

The jury convicted defendant of murder, possession of a firearm and possession of a firearm for an unlawful purpose. The State moved for imposition of a mandatory extended term sentence on the murder charge based on defendant's prior record. See N.J.S.A. 2C:43-7.1(b)(2). The court granted the State's motion and imposed an aggregate life sentence subject to the requirements of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. This appeal followed.

Defendant's counsel presents the following arguments for our consideration:

> POINT I
>
> REVERSAL IS REQUIRED BECAUSE THE STATE PRESENTED INADMISSIBLE TESTIMONY ABOUT UNNAMED WITNESSES IMPLICATING DEFENDANT, AND A DETECTIVE'S OPINION ABOUT WHO WAS PRESENT DURING THE SHOOTING. (Not Raised Below)
>
> A. Reversal Is Required Because the State Relied on Prejudicial Hearsay About Unnamed Witnesses Implicating Defendant, Including in Summation.
>
> B. Reversal Is Required Because the State Relied on Prejudicial Opinion Testimony to Show a Witness and Defendant Were Present During the Shooting.

POINT II

REVERSAL IS REQUIRED BECAUSE THE TRIAL
COURT WRONGLY INSTRUCTED THE JURY TO
ONLY CONSIDER THE LESSER CHARGE OF
PASSION/PROVOCATION MANSLAUGHTER IF IT
FIRST ACQUITTED DEFENDANT OF MURDER.
(Not Raised Below)

POINT III

THE CONVICTIONS MUST BE REVERSED
BECAUSE THE STATE DID NOT RECORD THE
WITNESSES' LEVELS OF CERTAINTY
REGARDING THEIR OUT-OF-COURT
IDENTIFICATIONS . . . AND THE TRIAL COURT
DID NOT CHARGE THE JURY ON THAT
OMISSION. (Not Raised Below)

POINT IV

THE PROSECUTOR ENGAGED IN REVERSIBLE
MISCONDUCT WHEN HE REPLAYED THE
WITNESSES' VIDEO STATEMENTS IN
SUMMATION, MADE UNSUPPORTED
COMMENTS ABOUT THE WITNESSES' FEAR OF
SNITCHING, VOUCHED FOR THE WITNESSES,
DISPARAGED THE DEFENSE . . . AND MADE
UNSUPPORTED COMMENTS ABOUT THE FIGHT.
(Partially Raised Below)

A. The Prosecutor Improperly Replayed Video of Key
Pretrial Witness Statements During Summation.

B. The Prosecutor Unfairly Bolstered the Credibility of
the State's Witnesses with Unsupported Comments
About their Fear of Being Labeled as Snitches.

10

C. The Prosecutor Committed Misconduct When He Made Unsupported Statements that Defendant Started the Fight and Received a Call to Confront the Decedent.

D. The Prosecutor Committed Misconduct When He Framed a Guilty Verdict as the "True" Result, Disparaged the Defense, and Vouched for the State's Witnesses.

POINT V

REVERSAL IS REQUIRED BECAUSE THE STATE RELIED ON EVIDENCE IRRELEVANT TO FLIGHT TO ARGUE CONSCIOUSNESS OF GUILT, AND THE COURT PROVIDED AN INCOMPLETE FLIGHT CHARGE. (Partially Raised Below)

POINT VI

THE CUMULATIVE EFFECT OF THE TRIAL ERRORS DEPRIVED DEFENDANT OF DUE PROCESS AND A FAIR TRIAL AND WARRANTS REVERSAL OF HIS CONVICTIONS. (Not Raised Below)

POINT VII

A REMAND FOR RESENTENCING IS REQUIRED BECAUSE THE COURT DID NOT ADEQUATELY EXPLAIN THE SENTENCE, LIMITED DEFENDANT'S ALLOCUTION WITHOUT EXPLANATION, AND IMPOSED A $200,000 FINE WITHOUT MAKING APPROPRIATE FINDINGS.

A. A Remand Is Required Because the Court Did Not Adequately Explain the Sentence Imposed.

A-4100-16T1

B. Resentencing Is Required Because the Court, Without Explanation, Denied Defendant's Request to Further Allocute in Response to the Prosecutor.

C. A Remand Is Required Because the Court Did Not Make Any Findings Regarding Defendant's Ability to Pay $200,000 in Discretionary Fines.

In his pro se supplemental brief, defendant presents the following arguments:

POINT I

CONVICTION WAS ACHIEVED BY PROSECUTORIAL MISCONDUCT IN VIOLATION TO DUE PROCESS. THE STATE DID NOT ESTABLISH "EVERY" ELEMENT [BEYOND] REASONABLE DOUBT REQUIRES REVERSAL[.]

A. A timely objection was not made reversal is requi[r]ed because it was prejudicial to use of the photo marked S20 to build the State's case by the use of the testimonial privile[]ge [.]

B. Prosecutorial Misconduct Administered by the State in Defendant's trial; where the State made Multiple improper prejudicial [comments] during Summations[.]

POINT II

REVERSAL IS REQUIRED DIRECTING THE TRIAL COURT TO REVOKE THE IMPOSED FINES, AND ASSES[S]MENTS . . . DUE TO ABUSE OF DISCRETION. BECAUSE THE DEFENDANT IS UNABLE TO PAY, AND SUCH IMPOSITIONS ARE ILLEGAL SENTENCES DISPOSED WITHOUT HOLDING A HEARING FOR ABILITY TO PAY,

12

WHICH ESTABLISH "CONSTITUTIONAL" ERROR, AND REQUIRES REVOCATION IN "WHOLE"[.]

POINT III

THE TRIAL JUDGE ERRED IN CHARGING FLIGHT TO THE JURY AS THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE INFERENCE THAT THE DEFENDANT'S ABS[]ENCE WAS A RESULT OF CON[S]CIOUSNESS OF GUILT, ESPECIALLY WHERE THE DEFENDANT'S KNOW[N] PLACES TO RESIDE [WERE] NOT INVESTIGATED AND WHERE DEFENDANT TURNED HIMSELF INTO AUTHORITIES ONCE HE BECAME AWARE THAT HE WAS A "SUSPECT" FOR THE CRIMES IN THE INSTANT CONVICTION. THUS DEFENDANT WAS DENIED A FAIR TRIAL[.]

POINT IV

RIGHT TO CONFRONTATION GUARANTEED BY THE SIXTH AMENDMENT WAS VIOLATED WHEN TRIAL COURT ALLOWED THE HEARSAY TESTIMONY OF DETECTIVE BRUCE BRANCH TO REPORT THAT HE QUESTIONED INFORMANTS . . . DISCLOSED THOSE FACTS TO THE JURY, BUT DEFENDANT WAS DEPRIVED TO CROSS-EXAMINE THOSE INFORMANTS, BECAUSE THEY DID NOT APPEAR IN COURT TO TESTIFY[.]

POINT V

THE TESTIMONY OF DR. ANDREW FALSON . . . THE SPOKESMAN AS THE STATE'S EXPERT . . . DID NOT PREPARE THE AUTOPSY

REPORT FINDINGS OF DR. ABRAHAM PHILLIP . . . THIS SPOLIATION OF DUE PROCESS, ALLOWED ONLY "NET OPINION" TESTIMONY INSTEAD OF "FACTUAL" TESTIMONY INFRINGED UPON THE DEFENDANT'S SIXTH AMENDMENT RIGHT OF CONFRONTATION, WITH THE ACTUAL MEDICAL EXAMINER WHO PREPARED THE AUTOPSY REPORT, CONSTITUTES TO CONSTIT[]UTIONAL ERROR[.]

POINT VI

TRIAL COURT SHOULD HAVE NOT DENIED DEFENDANT'S WADE/HENDERSON HEARING . . . AS A RESULT THE TRIAL COURT ABUSED IT[]S DISCRETION WHEN IT ERRED BY ALLOWING THREE OF THE STATE'S WITNESSES TO TESTIFY AT APPELLANT'S TRIAL, WHERE THE COURT AND STATE ALREADY WERE AWARE . . . THAT THE WITNESS WOULD EITHER TESTIFY INCONSISTENTLY TO THEIR PRIOR STATEMENTS . . . OR TESTIFY THAT THEY DID NOT REMEMBER THEIR PRIOR STATEMENTS EVER BEING GIVEN, ESTABLISHING PERJURED TESTIMONIES, AND THE STATE PROSECUTION HAVING "KNOWLE[D]GE" AND FAILING TO CORRECT SUCH PERJURED TESTIMONIES DENIED APPELLANT'S RIGHTS OF DUE PROCESS AND TO A FAIR TRIAL[.]

A. Inconsistent Testimony with out of court Statements[.]

B. State's Prosecutor's Knowing Use of Perjured Testimonies[.]

14

POINT VII

A COURT REVIEWING A CLAIM OF ACTUAL INNOCENCE MUST EXAMINE THE RECORDS AS A WHOLE- "'ALL THE EVIDENCE.' OLD AND NEW". THE EVIDENCE IS INSUFFICIENT TO WARRANT A CONTINUED CONVICTION OBTAINED BY NEPOTISM. REVERSAL IS NECESSARY TO DIRECT THE TRIAL COURT VACATE THE JUDGMENT OF CONVICTION, AND TO DIRECT THE ENTRY OF A NEW JUDGMENT OF ACQUITTAL . . . N.J. CONST. ART. I, PAR. 6; N.J. CONST. ART VI § 4, BECAUSE THE DEFENDANT IS ACTUALLY INNOCENT[.]

POINT VIII

THE TOTALITY OF THE CLAIMS RAISED ON THIS APPEAL CONCLUDE THAT THE SENTENCING COURT COMMITTED A CLEAR ABUSE OF DISCRETION. NERA "SHALL NOT APPLY" PURSUANT TO N.J.S.A. 2C:43-7(c). IMPOSITION OF DEFENDANT'S SENTENCE BEYOND THE STATUTORY MAXIMUM BASED ON JUDICIAL FACT-FINDING OF AGGRAVATING FACTORS . . . WHICH WAS NEVER ADMITTED TO BY DEFENDANT OR SUBMITTED TO A JURY AND PROVED BEYOND A REASONABLE DOUBT VIOLATED BOTH HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS. THERE ARE SUBSTANTIAL MITIGATING FACTORS IN THIS CASE. . . . AS A RESULT THE TRIAL COURT IMPOSED AN ILLEGAL SENTENCE REQUIRES THAT THE CONVICTION BE VACATED AND REVERSED TO THE TRIAL COURT[.]

15

A. The defendant expressed his remorse and the court had no consideration to it and imposed an illegal sentence.

B. Weapon's violations are not subject to NERA[.]

C. Defendant's last release from confinement was on November 27, 2014, there are no records of two or more prior convictions from that date. The court misapplied NERA to impose an illegal sentence

D. The Judicial fact-finding of aggravating factors which was never admitted to by the defendant or submitted to a jury and proved beyond reasonable doubt violated both his state and federal constitutional rights.

E. There are substantial mitigating factors.

F. The sentencing court committed a clear abuse of discretion[.]

POINT IX

THE CUMULATIVE ERRORS IN POINTS I THROUGH POINT VIII, HEREBY ESTABLISH THE DEFENDANT WAS DEPRIVED OF A FAIR TRIAL AND VIOLATED HIS RIGHT OF DUE PROCESS GUARANTEED BY THE U.S. CONST. AMEND. XIV, § 1, TOWARDS DEFENDING HIS RIGHT OF LIFE AND LIBERTY, GUARANTEED BY N.J. CONST. ART. I PAR. 1[.]

II.

Defendant challenges his conviction based on numerous claims concerning alleged errors by the trial court, almost all of which were not raised

before the trial court. Therefore, unless otherwise noted, we consider the alleged errors under the plain error standard. R. 2:10-2. "A defendant who does not raise an issue before a trial court bears the burden of establishing that the trial court's actions constituted plain error" because "to rerun a trial when the error could easily have been cured on request[ ] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal." State v. Santamaria, 236 N.J 390, 404-05 (2019) (quoting State v. Ross, 229 N.J. 389, 407 (2017)).

Under the plain error standard's "high bar," id. at 404, "[w]e may reverse . . . only if the error was 'clearly capable of producing an unjust result,'" Ross, 229 N.J. at 407 (quoting R. 2:10-2). "The possibility of an unjust result must be 'sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached.'" Ibid. (quoting State v. Williams, 168 N.J. 323, 336 (2001)).

Although we are compelled to assess most of defendant's arguments under the plain error standard, we must also consider the cumulative effect these errors had on defendant's fundamental right to a fair trial. State v. Jenewicz, 193 N.J. 440, 473 (2008). In doing so, we must determine whether "the probable effect of the cumulative error was to render the underlying trial unfair," State v.

<u>Wakefield</u>, 190 N.J. 397, 538 (2007), thereby "dictat[ing] the grant of a new trial before an impartial jury," <u>ibid.</u> (quoting <u>State v. Orecchio</u>, 16 N.J. 125, 129 (1954)).

A.

Defendant contends the prosecutor violated his rights under the Confrontation Clause of the United States Constitution, <u>U.S. Const.</u> amends VI, XIV, and New Jersey Constitution, <u>N.J. Const.</u> art. I, ¶¶ 1, 9, 10, as well as our hearsay rule, N.J.R.E. 802, by presenting evidence and making argument in summation implying that unnamed individuals who did not testify at trial provided information to the police implicating him in Mayse's murder. More particularly, he argues the prosecutor impermissibly elicited testimony from Detective Branch suggesting that unnamed individuals provided information that led to the identification of defendant as a suspect. Defendant further asserts the prosecutor reinforced the notion that other non-testifying witnesses identified defendant as the shooter in comments made during his summation.

On April 28, 2015, the day Mayse was shot and killed, Clark and J.S. denied witnessing the shooting to officers at the scene and again later to Detective Branch at the hospital. Detective Branch testified that after leaving the hospital, he canvassed the apartments in the area of the shooting for

witnesses. Detective Branch testified that he spoke with individuals who were willing to provide him with information, but unwilling to provide their names or appear at the prosecutor's office to "give statements." Detective Branch further explained that he identified surveillance cameras he believed might have recorded events relevant to the investigation, obtained recordings from those cameras and reviewed them.

For the first time on appeal, defendant challenges Detective Branch's testimony that defendant was already a suspect when he reviewed the recordings and that he reviewed the recordings for the purpose of looking for defendant:

> [Q]: Now, at a certain point, you also became aware of [defendant] as your suspect in the case; is that correct?
>
> [A]: Yes.
>
> [Q]: Were you—did you put—as you reviewed those videos, were you looking for [defendant] on those videos?
>
> [A]: Uh, yes.
>
> [Q]: Did you find [defendant] on some of those videos?
>
> [A]: Yes.
>
> [Q]: And, as you were watching those videos, did you find anybody else who matched his description in terms of clothing, build, hairstyle, around that time in that area?

[A]: Yes.

[Q]: Were there other people, beside [defendant], who fit that description as the suspect?

[A]: Uh, the description of [defendant]?

[Q]: Yes. So, aside from [defendant], were there other people on those videos who looked like [defendant], [who] would be easily confused for him?

[A]: No.

Defendant contends Detective Branch's testimony that he canvassed the area, spoke with witnesses who were willing to provide information but not their names or formal statements, and later reviewed the video recordings looking for defendant as the suspect leads to the inescapable conclusion that non-testifying witnesses identified defendant as the shooter. Defendant claims the testimony runs afoul of the principles established in State v. Bankston because it supports an inescapable inference that non-testifying witnesses identified defendant as the perpetrator of the offenses for which he was charged. 63 N.J. 263, 268-69 (1973).

The State argues the prosecutor elicited testimony from Detective Branch about his "unsuccessful canvasses for additional witnesses to show Detective Branch conducted a thorough investigation, left no stone unturned and did not arbitrarily target defendant." The State also contends Detective Branch's

20

identification of defendant as a suspect was based on "a trove of evidence," including J.S.'s and Clark's statements and physical descriptions of the shooter and Detective Branch's review of the video recordings, and that Detective Branch's testimony establishes he reviewed the recordings for defendant only after Clark and J.S. identified him.

We reject the State's assertion that Detective Branch's challenged testimony does not identify the time he reviewed the recordings and, as a result, it could reasonably be inferred that Detective Branch's identification of defendant as a suspect was the product of the identifications of defendant provided by testifying witnesses—J.S. and Clark—in the days following the shooting. The assertion is contradicted by the record.

The prosecutor asked Detective Branch about his review of the recordings with only a temporal reference to "a certain point," but Detective Branch's description of his investigation was linear and chronological and, when fairly read in context, shows he obtained a description of defendant and identified him as a suspect following his canvas of the apartments for witnesses and review of the recordings before any testifying witness identified defendant as the shooter or provided defendant's description. Indeed, the prosecutor understood that Detective Branch testified that he reviewed the recordings on April 28, 2015,

21

the day of the murder. Immediately after the challenged colloquy, the prosecutor instructed Detective Branch, "I'm going to draw your attention to the . . . next day, the morning of April 29th, 2015," and asked, "What did you do with regard to this—investigation that morning?" (Emphasis added). The only logical interpretation of Detective Branch's testimony is that he identified defendant as a suspect, obtained defendant's description and reviewed the recordings on April 28, 2015, prior to the identification of defendant first made by J.S. on April 29 and next by Clark on April 30.

"[B]oth the Confrontation Clause and the hearsay rule are violated when, at trial, a police officer conveys, directly or by inference, information from a non-testifying declarant to incriminate the defendant in the crime charged." State v. Branch,[4] 182 N.J. 338, 350 (2005) (citing Bankston, 63 N.J. at 268-69). Our Supreme Court has explained that the "common thread" running through Confrontation Clause jurisprudence "is that a police officer may not imply to the jury that he [or she] possesses superior knowledge, outside the record, that incriminates the defendant." Id. at 351. In addition, "[w]hen the logical implication to be drawn from the testimony leads the jury to believe that a non-

_____

[4] The defendant in this Supreme Court opinion is not related to Detective Branch.

testifying witness has given the police evidence of the accused's guilt, the testimony should be disallowed as hearsay." Bankston, 63 N.J. at 271; see also State v. Irving, 114 N.J. 427, 446 (1989) (finding improper a police officer's testimony that after he canvassed the neighborhood looking for leads, "he focused on the defendant as the subject of his investigation and placed his picture in the [photo] array").

Here, the record is bereft of evidence that any testifying witness either identified defendant as the shooter or provided a description of defendant prior to Detective Branch's review of the recordings on April 28, 2015. To the contrary, on April 28 J.S. and Clark denied witnessing the shooting and did not identify or describe the shooter.[5] Thus, Detective Branch's testimony that on April 28 he reviewed the recordings for defendant as a suspect and with a description of defendant supported an "inescapable inference" that non-testifying witnesses informed Detective Branch that defendant was the shooter and provided a description of defendant. Bankston, 63 N.J. at 271. As the Court observed in Branch, "the jury was left to speculate that the detective had superior knowledge through hearsay information implicating defendant in the crime[s]."

---

[5] As noted, J.S. did not identify defendant as the shooter until April 29, 2015, and Clark did not provide a statement identifying defendant as the shooter until April 30, 2015.

182 N.J. at 347-48. The trial court erred by allowing the testimony; its admission "violated defendant's federal and state rights to confrontation as well as our rules of evidence." Id. at 348.

Detective Branch provided further support for the inference that non-testifying witnesses identified defendant as a suspect when he explained to the jury his selection of the photographs for the photo arrays shown to J.S., Clark and Perna. Detective Branch identified defendant as the suspect prior to his construction of the photo arrays shown to putative witnesses. And he expressly testified he included the suspect's picture in the photo array "[b]asically based on . . . sources or information" that he received "during [his] investigation." Because J.S. was the first testifying witness that identified defendant, Detective Branch's testimony concerning his decision to include the suspect's photo in the array also supported the inescapable inference that defendant, who Detective Branch said was the suspect, had been identified as the shooter based on "sources or information" from non-testifying witnesses.

In Branch, the Court observed that the reason an "officer place[s] the defendant's photograph in the array is of no relevance to the identification process and is highly prejudicial." 182 N.J. at 352. Yet that is precisely what Detective Branch did here; he "implied that he had information from an out-of-

court source, known only to him, implicating defendant in the" crimes charged, id. at 353, and "the jury heard irrelevant, 'gratuitous hearsay testimony' that violated defendant's right to confrontation and the rules of evidence," State v. Lazo, 209 N.J. 9, 21 (2012) (quoting Branch, 182 N.J. at 348). "By doing so, [Detective Branch] enhanced the [other witnesses'] credibility and intruded on the jury's role." Id. at 22.

Detective Branch's reliance on information provided by non-testifying witnesses to support his selection of defendant's photo for inclusion in the photo array shown to J.S. was not only clear from his testimony, it was further confirmed by the prosecutor during summation. Addressing Detective Branch's selection of the photograph, the prosecutor explained that "[t]here are limitations on what . . . [Detective] Branch can testify to, based [on] the evidence rules and hearsay rules . . . but, as [Detective Branch] indicated, in the legally permissible way, based on information he received, he decided to put [defendant] in the photo array." In other words, the prosecutor confirmed for the jury exactly what the Supreme Court in Branch prohibited—that defendant's photo was selected for inclusion in the photo array based on "information [Detective Branch] received" from non-testifying witnesses, see Branch, 182 N.J. at 352—and urged the jury to consider that testimony in assessing the credibility of the witnesses'

out-of-court identifications of defendant in its determination of defendant's guilt or innocence on the charges.

Moreover, Detective Branch did not "indicate, in the legally permissible way," the reason he selected defendant's photograph for inclusion in the photo array. As our Supreme Court has explained, a witness cannot testify that a defendant's photograph was selected based "'upon information received.' Even such seemingly neutral language, by inference, has the capacity to sweep in inadmissible hearsay. It implies that the police officer has information suggestive of the defendant's guilt from some unknown source." Ibid. The prosecutor could not properly do indirectly what our Supreme Court prohibits a witness from doing directly: argue to the jury that the inclusion of a photo in an array was based on information provided by non-testifying witnesses. See ibid.

Contrary to the State's contention, the prosecutor's argument was not made proper because it was made in response to defense counsel's assertion that Detective Branch had no basis to select defendant's photograph. "In contexts other than a photographic identification" a police officer may testify he or she relied on "information received" "to explain their actions, but only if necessary to rebut a suggestion that they acted arbitrarily and only if the use of that phrase does not create an inference that the defendant has been implicated in a crime

by some unknown person." Ibid. (emphasis added). Here, reliance on the refuge of "information received" to explain the selection of defendant's photograph was not available to either Detective Branch or the State because it involved a photographic identification and the testimony and argument created the highly prejudicial, inescapable inference that non-testifying witnesses implicated defendant in the commission of the crimes for which he was charged. Ibid.

Defendant objected to the prosecutor's argument, but only on the basis that the State improperly suggested there was information the jury should consider, even though not admitted in evidence. The court provided a limiting instruction in response to defendant's objection, advising the jury that counsels' closing arguments do not constitute evidence and the jury should rely on its own recollection of the evidence. Defense counsel advised the court that she did not object to the prosecutor's statement that Detective Branch's decision to include defendant's photo in the array was "based on information he received." The court's instruction therefore did not address the issue now raised on appeal— that the prosecutor's reference to the information received supported the inescapable inference that Detective Branch relied on information supplied by non-testifying witnesses implicating defendant in the crimes for which Detective Branch identified him as a suspect.

"When evidence is admitted that contravenes not only the hearsay rule but also a constitutional right, an appellate court must determine whether the error impacted the verdict." State v. Weaver, 219 N.J. 131, 154 (2014). Where, as here, there was no objection to Detective Branch's testimony about his review of the recordings and selection of defendant's photograph, the prosecutor's erroneous argument that defendant's photograph was selected based on information received, or the court's curative instruction that did not address Detective Branch's impermissible testimony, our standard of review requires that we determine if the errors were clearly capable of producing an unjust result. Branch, 182 N.J. at 353; see also State v. Kemp, 195 N.J. 136, 156 (2008) (finding that even where testimony may implicate "the concerns[] interdicted by Bankston," a reversal is not required where the totality of the circumstances leads to the conclusion that admission of the evidence was harmless).

The assessment of whether the errors in admitting Detective Branch's testimony, allowing the prosecutor's comments and in providing the putative curative instruction impacted the jury's verdict requires consideration of the strength of the State's case, the other evidence presented and any other trial errors. See, e.g., State v. Hightower, 120 N.J. 378, 410 (1990). That analysis is informed by a recognition that the primary issue—indeed the only contested

issue upon which defendant's guilt or innocence depended—was the identification of the shooter.

The State did not present forensic evidence tying defendant to Mayse's murder, and the video recordings did not capture the shooting. Thus, the identification of defendant as the shooter turned on the testimony of the three putative eyewitnesses: J.S., Clark and Perna. We appreciate that each of the witnesses identified defendant in photo identification procedures and that those identifications, if accepted as credible, support the jury's verdict. Perna also identified defendant in still photographs taken from the video recordings, and J.S. and Perna identified defendant as the shooter at trial. But the reliability of the witnesses and their respective identifications of defendant as the shooter were not without issue.

J.S. and Clark identified defendant in the photo arrays administered in the days following the shooting. However, in the hours immediately following the shooting, they separately told the police they did not see either the shooting or the shooter. J.S. offered reasons for her initial denial—she did not want to be identified as a snitch—and the State argued Clark initially denied seeing the shooting for the same reason. But the record nonetheless permits the conclusion that J.S. and Clark lied either initially to the police or later in their statements.

29

Moreover, at trial Clark denied any recollection of the shooting. Although the court determined his claimed lack of memory was feigned and allowed admission of his recorded statement as a result, Clark did not affirmatively testified at trial that he observed the shooting or the shooter. Moreover, if his lack of recollection was feigned, he lied while under oath before the trial court.

Perna's testimony is likewise filled with disturbing details. She waited almost six weeks to contact the police about her observations; the evidence also established that at the time of the murder, she allowed Mayse to use her apartment to sell drugs in exchange for drugs that she used. The evidence also showed inconsistencies between her recorded statement and trial testimony, and suggested a motive for her identification of defendant—a dispute between Mayse, for whom she was a maternal figure, and defendant over a drug sale in her apartment on the evening prior to the murder.

We need not, and do not, resolve the credibility issues presented by the witnesses or assess which version of the events they provided before and during trial is more believable or persuasive. Instead, we determine only that in light of the evidence otherwise supporting a challenge to the credibility of the witnesses who provided the identifications that were the lifeblood of the State's case, we cannot discount the prejudicial effect of Detective Branch's testimony

that he received information from non-testifying witnesses supporting his identification of defendant as the suspect. The record provided a substantial basis for the jury to question the credibility and reliability of the witnesses' identifications of defendant. Thus, the admission of Detective Branch's testimony, the allowance of the prosecutor's argument that other non-testifying witnesses or "information [Detective Branch] received" identified defendant as the suspect and the court's ineffective curative instruction concerning the prosecutor's improper argument not only deprived defendant of his constitutional rights, it was highly prejudicial, unfair and supports a reasonable doubt about whether the testimony and prosecutor's argument caused the jury to reach a verdict it would have otherwise not reached. In other words, admission of the testimony and allowance of the argument constituted plain error requiring reversal of defendant's conviction and a remand for a new trial. See Branch, 182 N.J. at 353-54. The prejudice to defendant is not diminished by the fact that the testifying witnesses selected defendant's photo from the arrays. To the contrary, the witnesses' selections of the photos may have impermissibly served to confirm what Detective Branch explained, and the prosecutor emphasized: that non-testifying witnesses had identified defendant as the shooter.

31

B.

The prejudicial effect of Detective Branch's testimony, the prosecutor's comments regarding Detective Branch's testimony, and the court's ineffective curative instruction was further exacerbated by additional errors, including the erroneous admission of Detective Branch's testimony identifying defendant on the video recording. Defendant did not object to the testimony, but it was clearly inadmissible as lay opinion testimony under Rule 701. See N.J.R.E. 701.

The admission of lay opinion testimony is allowed under Rule 701, which provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue.
>
> [N.J.R.E. 701.]

Opinion testimony may not "intrude on the province of the jury by offering, in the guise of opinions, views on the meaning of facts that the jury is fully able to sort out . . . [or] express a view on the ultimate question of guilt or innocence." State v. McLean, 205 N.J. 438, 457 (2011) (citations omitted). "[L]ay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 460. To be

admissible, lay opinion testimony must be founded on a witness's perception which must "rest[] on the acquisition of knowledge through use of one's sense of touch, taste, sight, smell or hearing." Id. at 457.

A fact witness is one who testifies as to what "he or she perceived through one or more of the senses." Id. at 460. "Fact testimony has always consisted of a description of what the officer did and saw[.]" Ibid. "Testimony of that type includes no opinion, lay or expert, and does not convey information about what the officer 'believed,' 'thought' or 'suspected,' but instead is an ordinary fact-based recitation by a witness with first-hand knowledge." Ibid.

Detective Branch's testimony identifying defendant as appearing in the recordings constituted an inadmissible lay opinion under Rule 701. It was not based on Detective Branch's personal perceptions of defendant— Detective Branch was not present for, and not did not witness, the shooting—and intruded on the jury's role by "offering the view of the witness about . . . facts that the jury [could] evaluate for itself or an opportunity to express a view on guilt or innocence."[6] McLean, 205 N.J. at 462. In addition, there were other witnesses,

_____

[6] In contrast, Detective Branch's testimony identifying Clark as appearing on the video recordings constituted proper lay opinion testimony. Detective Branch saw Clark immediately following the shooting, interviewed him at the hospital and observed what Clark was wearing, including Clark's distinctive red

J.S., Clark and Perna, who testified they witnessed the shooting and identified defendant. See Lazo, 209 N.J. at 23 ("Courts evaluating whether a law enforcement official may offer a lay opinion on identification also consider, among other factors, whether there are additional witnesses available to identify the defendant at trial."). More importantly, the testimony added to the prejudice resulting from Detective Branch's other testimony and the prosecutor's comments during summation concerning the identification of defendant as a suspect by non-testifying witnesses because it bolstered the challenged identifications made by J.S., Clark and Perna with an impermissible identification of defendant by the detective in charge of the murder investigation. "In an identification case, it is for the jury to decide whether an

---

sweatpants. His identification of Clark on the recording was based on his personal perceptions of Clark on the day of the shooting. His testimony that he recognized Clark on the recording was founded on those perceptions, assisted the jury in determining whether Clark was present at the scene, and therefore constituted proper lay opinion testimony under Rule 701. See, e.g., State v. Carbone, 180 N.J. Super. 95, 96-97 (Law. Div. 1981) (finding admissible as lay opinion testimony concerning photographic identifications of defendant in an armed robbery prosecution by witnesses who had personal knowledge of the defendant's appearance at the time of the robbery, but who were not present when the robbery occurred); cf. Lazo, 209 N.J. at 24 (finding a police officer's testimony that the "defendant's arrest photo closely resembled the composite sketch" was inadmissible lay opinion because the officer "had not witnessed the crime and did not know defendant; the officer's opinion stemmed entirely from the victim's description").

eyewitness credibly identified the defendant. . . . Neither a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province." Id. at 24.

Although we might not otherwise conclude that Detective Branch's testimony identifying defendant on the video recording alone constitutes a plain error, R. 2:10-2, we are convinced the cumulative effect of its admission with the erroneous admission of Detective Branch's testimony concerning the identification of defendant as a suspect and inclusion of defendant in the photo arrays rendered defendant's trial unfair. The State presented its case in a thoughtful and strategic manner and, in our view, it is not by chance that the State, in recognition of the credibility challenges to its three putative eyewitnesses, sought to bolster its proofs on the only issue that mattered—the identification of the shooter. It did so in a subtle but persuasive manner by using Detective Branch's testimony to first establish the inescapable inference that non-testifying witnesses had identified defendant as the shooter and, as if that were not enough, by then asking Detective Branch to identify defendant on the recording even though Detective Branch was not present when the shooting

occurred.[7] Defendant should have objected to the testimony, but the lack of an objection does not obviate the fact that Detective Branch's unchallenged testimony was highly prejudicial, unfair and cumulatively requires the conclusion that its admission was clearly capable of producing an unjust result requiring a reversal of defendant's conviction. Jenewicz, 193 N.J. at 473-74.

## C.

Our conclusion there was plain and cumulative error warranting a reversal of defendant's conviction based on the admission of Detective Branch's testimony concerning his identification of defendant as a suspect prior to his review of the recordings, his selection of defendant's photograph for inclusion in the photo arrays, and his identification of defendant on the video recordings renders unnecessary a consideration of all defendant's remaining claims, most

---

[7] We also observe that the State further sought to directly bolster the credibility of the witnesses' identifications of defendant by playing portions of the recordings of J.S.'s and Perna's identifications and the entirety of Clark's statement and identification of defendant during closing arguments. On appeal, the State concedes the credibility of the witnesses' identifications constituted the fulcrum upon which defendant's guilt was based—the State argues the playing of the recordings during closing arguments was required in response to defense counsel's "strenuous[] urg[ing]" that the witnesses' identifications of defendant were not credible.

A-4100-16T1

of which were not before the trial court and which can be addressed and raised on the record extant during the retrial.[8]

We will, however, address two claims pertinent to the matter on remand. First, defendant argues the judge wrongly instructed the jury that it could only consider the lesser-included offenses to murder if it acquitted defendant of murder. See State v. Coyle, 119 N.J. 194, 222-23 (1990). More particularly, defendant argues the murder charge and the lesser-included offense of passion/provocation manslaughter should have been instructed together and the verdict sheet should have been tailored to ensure the two charges were considered together and not sequentially.

"[A]ppropriate and proper charges [to a jury] are essential for a fair trial." State v. Baum, 224 N.J. 147, 158-59 (2016) (quoting State v. Reddish, 181 N.J. 553, 613 (2004)). A trial court has an "independent duty . . . to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case, irrespective of the particular language suggested by either

---

[8]  For example, if the prosecutor intends to replay the video recordings of the identification procedures during his or her summation, the issues shall be addressed by the parties and the court at the appropriate time in accordance with the procedure required by State v. Muhammad, 359 N.J. Super. 361, 380-83 (App. Div. 2003). Similarly, the court shall consider the appropriateness and content of any proposed flight charge based on the evidence presented during the retrial.

party." Id. at 159 (alteration in original) (quoting Reddish, 181 N.J. at 613). "Because proper jury instructions are essential to a fair trial, 'erroneous instructions on material points are presumed to' possess the capacity to unfairly prejudice the defendant." Ibid. (quoting State v. Bunch, 180 N.J. 534, 541-42 (2004)).

Defendant was charged with first-degree attempted murder and with the lesser-included charges of attempted passion/provocation murder and aggravated manslaughter. The court instructed the jury on the charges in accordance with the model jury instructions and defendant neither requested a change to the court's proposed jury charges on the offenses nor to the verdict sheet. We therefore review the court's instructions and verdict sheet for plain error, R. 2:10-2, and will not reverse unless there is an error that is sufficient to raise a "reasonable doubt . . . as to whether the error led the jury to a result it otherwise might not have reached," State v. Funderburg, 225 N.J. 66, 79 (2016) (alteration in original) (quoting State v. Jenkins, 178 N.J. 347, 361 (2004)).

In the context of a jury charge, plain error is a "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust

result." State v. Camacho, 218 N.J. 533, 554 (2014) (alteration in original) (quoting State v. Adams, 194 N.J. 186, 207 (2008)). We consider the jury instructions "as a whole" to determine if an error constitutes plain error. State v. Brown, 190 N.J. 144, 160 (2007) (quoting State v. Torres, 183 N.J. 554, 564 (2005)). "[T]here is a presumption that [a] charge was not [in] error and was unlikely to prejudice the defendant's case" where, as here, there was no objection to the charge. State v. Singleton, 211 N.J. 157, 182 (2012). We find no plain error here.

We consider "[t]he verdict sheet[] in conjunction with the jury charges." State v. Galicia, 210 N.J. 364, 386 (2012). As our Supreme Court recently stated:

> A verdict sheet is intended for recordation of the jury's verdict and is not designed to supplement oral jury instructions. See State v. Reese, 267 N.J. Super. 278, 287 (App. Div.), certif. denied, 134 N.J. 563 (1993). Although a verdict sheet should list all elements of each offense, or no elements of any offense, our inquiry focuses on whether the jury understood the elements as instructed by the judge, and was not misled by the verdict sheet. See ibid. Where we conclude that the oral instructions of a court were sufficient to convey an understanding of the elements to the jury, and where we also find that the verdict sheet was not misleading, any error in the verdict sheet can be regarded as harmless. See id. at 287-89; State v. Vasquez, 265 N.J. Super. 528, 547 (App. Div.) (finding no reversible error where verdict sheet was erroneous but jury received proper

39

oral instruction, because "[t]he jury is presumed to have understood [the] instructions" (citation omitted)), certif. denied, 134 N.J. 480 (1993); see also Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 418 (1997) (stating that judge's charge and interrogatories to jury do not provide grounds for reversal unless misleading, confusing, or ambiguous).

[State v. Gandhi, 201 N.J. 161, 196-97 (2010).]

A purposeful killing in New Jersey can be either murder or the lesser-included offense of passion/provocation manslaughter. See State v. Grunow, 102 N.J. 133, 138-40 (1986). Here, defendant does not argue that the passion/provocation manslaughter charge was incorrectly included in the jury instruction.

In Coyle, the Court addressed the jury instructions that must be given where evidence in the record supports a finding of passion/provocation manslaughter. 119 N.J. at 221. The Court noted that where evidence of passion/provocation exists, the State may only obtain a murder conviction if it proves beyond a reasonable doubt that the purposeful killing was not the product of passion/provocation. Ibid.

Here, the judge correctly instructed the jury on the elements of murder and passion/provocation manslaughter in accordance with the model criminal jury instructions. See Model Jury Charges (Criminal), "Murder,

Passion/Provocation and Aggravated/Reckless Manslaughter (N.J.S.A. 2C:11-3(a)(1) and (2); 2C:11-4(a), (b)(1) and (2))" (rev. June 8, 2015). In pertinent part, the court instructed the jury that defendant is guilty of murder if they found "beyond a reasonable doubt that [he] purposely or knowingly caused . . . Mayse'[s] death, or serious bodily injury that then resulted in death, and that he did not act in the heat of passion resulting from a reasonable provocation, the defendant would be guilty of murder." (Emphasis added). In its charge on the offense of passion/provocation manslaughter, the court instructed that if the jury found "defendant purposely or knowingly caused death, or serious bodily injury that then resulted in death, and that he did act in the heat of passion resulting from a reasonable provocation, the defendant would be guilty of passion/provocation manslaughter." These instructions accurately described the different elements of the offenses at issue in this case in accordance with the requirements in <u>Coyle</u>. 119 N.J. at 221.

Defendant contends that the court's charge and the verdict sheet erroneously instructed the jury to consider the murder and passion/provocation charges sequentially, and that it was necessary that the court instruct the jury that it should consider the charges at the same time. Defendant ignores that the State was required to prove the absence of passion/provocation as an element of

the murder charge, and the jury necessarily considered the issue of passion/provocation when it found defendant guilty of murder. In other words, even accepting defendant's contention it was error for the court not to expressly instruct the jury to consider the charges at the same time and for the verdict sheet not to direct the jury to do so, defendant suffered no prejudice from the purported errors because in the jury's consideration of the murder charge, it found beyond a reasonable doubt that the State proved an absence of passion/provocation. We find no plain error in the court's instructions or the verdict sheet, see, e.g., Gandhi, 201 N.J. at 197, but do not limit the parties from requesting different jury instructions or a verdict sheet based on the evidence presented at defendant's retrial.[9]

We also consider defendant's claim that the court erred by denying his request for an evidentiary hearing on the admissibility of out-of-court identifications of defendant made by J.S., Clark and Perna, and by denying his

---

[9] We remind the parties and trial court of the availability of the Supreme Court Committee on Model Criminal Jury Charges' Criminal Sample Verdict Sheets, which include a "Sample Verdict Sheet (Murder (Own Conduct, Passion/Provocation and Aggravated/Reckless Manslaughter)), Revised [June 8, 2015]," and commend its use on remand if appropriate based on the evidence presented. We note the sample verdict sheet requires that the jury render its verdicts on murder and passion/provocation manslaughter in response to a single question.

A-4100-16T1

motion to exclude evidence concerning the identifications at trial. We review an order denying a motion to bar an out-of-court identification under the standard we apply in "our review of a trial court's findings in any non-jury case." State v. Wright, 444 N.J. Super. 347, 356 (App. Div. 2016). We accept the court's findings that are "supported by sufficient credible evidence in the record," State v. Gamble, 218 N.J. 412, 424 (2014), and review de novo the court's legal conclusions "and the consequences that flow from established facts," id. at 425.

To obtain an evidentiary hearing on the admissibility of eyewitness identification evidence, "a defendant has the initial burden of showing some evidence of suggestiveness that could lead to a mistaken identification." Henderson, 208 N.J. at 288. That evidence must generally be tied to one of the system variables identified by our Supreme Court in Henderson. Id. at 288-89.

Before the trial court, defendant asserted only that the photo identification proceedings during which J.S., Clark and Perna identified defendant were suggestive because Clark described the shooter as a dark-skinned male and the photographs included in the arrays shown to the witnesses included light-skinned males and J.S. refused to sign the photo she selected. The court reviewed the photographs shown to the witnesses, determined that the

photographs depicted individuals sharing similar skin tones, rejected the notion that J.S.'s refusal demonstrated any evidence of suggestiveness and found no evidence supporting defendant's claim that the photo identification procedures were suggestive. We find defendant's claim that J.S.'s refusal to sign the photo she selected demonstrated suggestiveness lacks sufficient merit to warrant further discussion. R. 2:11-3(e)(2). We have also reviewed the photographs and are satisfied they provide sufficient credible evidence supporting the court's findings, Gamble, 218 N.J. at 424, and legal conclusion that defendant failed to sustain his burden of demonstrating sufficient suggestiveness to warrant an evidentiary hearing on the admissibility of the out-of-court identifications of defendant, Henderson, 208 N.J. at 288.

For the first time on appeal, defendant argues the court erred by allowing evidence concerning the out-of-court identifications because the officers who conducted the photo identification procedures did not record the witnesses' statements concerning their levels of confidence as required under Rule 3:11(c)(7) and State v. Delgado, where our Supreme Court held that law enforcement officers are required to make "a written record detailing the out-of-court identification procedure, including . . . the dialogue between the witness and the interlocutor, and the results." 188 N.J. 48, 63 (2006). We consider

44

defendant's argument under the plain error standard because, again, it was not raised before the trial court. R. 2:10-2. Thus, "it is defendant's burden to demonstrate that the police failed to create an adequate record of the [out-of-court identification procedure] and that such failure was clearly capable of producing an unjust result." Wright, 444 N.J. Super. at 362-63.

Here, the State complied with the recordation requirements imposed by Rule 3:11 and Delgado; the photo identification procedures for J.S., Clark and Perna were video recorded and the subject of written reports by the officers who conducted them. Those records, however, do not include the witnesses' statements of their levels of confidence in their selection of defendant's photo because they were not asked by the officers to state their levels of confidence.

"It is . . . critical for law enforcement to record a witness' full statement of confidence when an identification is first made—before any possible feedback," State v. Anthony, 237 N.J. 213, 226 (2019), because without such a recording "the defendant may not learn about confirmatory feedback or other suggestive behavior," id. at 233. Although it appears defendant was not deprived of any information about possible feedback because the photo identification procedures were video recorded, and defendant was provided with the recordings prior to trial, on remand defendant may request an evidentiary

hearing based on his claim that, as a result of the officers' failures to request the respective witnesses' level of confidence, the photo identification procedures were suggestive. See generally, id. at 233-34. We offer no opinion on the merits of such a request, which the court shall consider and determine based on the record presented.

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4100-16T1